**In re Z.P., a Minor Child.**

**Appeal of Lycoming County Children and Youth Services.**

Superior Court of Pennsylvania.

Argued Nov. 17, 2009.
Filed April 9, 2010.
Reargument Denied May 28, 2010.

Charles F. Greevy, III, Williamsport, for appellant.

Edward J. Rymsza, Williamsport, for D.B., appellee.

Stephanie E. Lombardo, Public Defender, Williamsport, K.P., appellee.

John P. Pietrovito, Muncy, Guardian Ad Litem.

BEFORE: STEVENS, GANTMAN, and ALLEN, JJ.

OPINION BY GANTMAN, J.:

¶1 Appellant, Lycoming County Children and Youth Agency ("Agency"), appeals from the order entered in the Lycoming County Court of Common Pleas, which denied the Agency's petition to terminate Father's parental rights with respect to his minor child, Z.P. Upon a thorough review of the record, the arguments

presented, and the applicable law, we hold the court erred in denying the termination petition. Accordingly, we reverse the order denying the Agency's petition and remand with instructions to terminate Father's parental rights.

¶ 2 The Orphans' court opinion sets forth most of the relevant facts and procedural history of this appeal as follows:

The minor child Z.P. has been in resource care since November 7, 2007.

\* \* \*

[Father] has never visited with Z.P. [Father] has been incarcerated since September 30, 2007, prior to Z.P.'s birth, until June 1st, 2009. Visits with Z.P. were not available to [Father] while he was incarcerated. [Father] was recently transferred to a pre-release center in Harrisburg, Pennsylvania. Soon after transfer, [Father] requested a visit with Z.P. Mr. Bruce Anderson, psychologist, testified that there is no bond between [Father] and Z.P. because there have been no visits between the two. Mr. Anderson did not rule out that Z.P. could bond with [Father] but did state that a change of resource parents for Z.P. would be traumatic for him. ... [Father] requested that Ms. [Minnier], Z.P.'s case worker, give him monthly updates on Z.P.'s welfare. Upon learning of his possible paternity, [Father] corresponded with the [A]gency monthly. [Father] also corresponded on one occasion with Z.P.'s [court-appointed special advocate].

A petition for involuntary termination of parental rights was filed on March 11, 2009. The termination hearing took place on June 22nd and June 23rd.

\* \* \*

[Mother] failed to be present for the termination hearing on either day. [Father] did appear in person and testified on his own behalf.

[Father] is currently serving a state sentence for drug delivery. He has been arrested and served county sentences on at least two other occasions for drug related offenses. He has a lengthy history of drug and alcohol abuse resulting in psychotic episodes and hospitalization. [Father] had violated probation on at least one occasion. [Father] has been incarcerated for the full duration of Z.P.'s life. [Father] did send a birthday card for Z.P.'s only birthday as well as pictures of himself. While incarcerated, [Father] completed SCI Camp Hill's "Wellness" program, SCI Laurel Highlands "Thinking for a Change" program and the "Batterers Group" program. [Father] is also presently taking parenting classes and goes to AA and NA meetings five times a week. According to Ms. [Minnier], Agency [c]aseworker, [Father] "[d]id everything [that was] available to him to try to meet the parenting objectives that he [had]" and [did "all that he was capable of doing" within prison]. Corrections Counselor Michael Wilson testified that [Father] was an average inmate, was misconduct free and had no behavioral problems. [Father] also attended ... permanency hearings in person or by telephone.

[Father] has fathered eight children, 3 of [whom] are currently over the age of 18, 1 of whom [Father]'s parental rights [to] were voluntarily terminated. [Father] was not living with any of his children at the time of his arrest. Two of [Father]'s children who are under the age of 18 also belong to Jill Bentley, [Father's] ex-wife. The children's ages are 7 and 3. Ms. Bentley and the two children visited with [Father] on several occasions while he was at SCI–Laurel Highlands. Ms. Bentley testified that interaction between [Father] and their

children was good. [Father] and Ms. Bentley are attempting to reconcile.... [Father] [perpetrated] on at least one occasion ... domestic violence against Ms. Bentley while under the influence of drugs and/or alcohol. While incarcerated, [Father] asked the agency if Ms. Bentley could take care of Z.P. Ms. Bentley is still willing to be a resource for Z.P. [Father] also requested that his mother, Stephanie Bibbins, be considered as a resource for Z.P. Ms. Bibbins has never met Z.P. personally nor has she affirmatively agreed to be a resource for him.

[Father] has completed three years of college education. He plans to return to college and seek employment as a drug and alcohol counselor. He currently receives social security disability compensation in the amount of $1200 per month plus direct payments to [some of] his children.

(Orphans' Court Opinion, filed June 26, 2009, at 1–4).

¶ 3 By order filed June 26, 2009, the court terminated Mother's parental rights, but denied the Agency's petition to terminate Father's parental rights. The Agency timely filed a notice of appeal on July 9, 2009. The court ordered a Rule 1925(b) statement on July 13, 2009. The Agency subsequently filed a supplemental notice of appeal and a concise statement on July 14, 2009. The Guardian *Ad Litem* for Z.P. also appealed the court's decision by notice filed July 16, 2009, and docketed as a companion appeal at No. 1241 MDA 2009.

¶ 4 The Agency raises three issues for our review:

WHETHER THE [ORPHANS'] COURT DECISION DENYING THE TERMINATION OF [FATHER'S] RIGHTS SHOULD BE REVERSED BASED UPON ITS FAILURE TO CONSIDER ALL OF THE RELE-VANT GROUNDS UNDER SECTION [2511(A)] OF THE PENNSYLVANIA ADOPTION ACT?

WHETHER THE [ORPHANS'] COURT PROPERLY CONSIDERED REQUIREMENTS OF THE PENN-SYLVANIA ASFA PROVISIONS OF THE PENNSYLVANIA JUVENILE ACT AS IT RELATES TO PERMA-NENCY FOR THE CHILD?

WHETHER THE [ORPHANS'] COURT WAS CORRECT IN ITS DE-TERMINATION OF THE NEEDS AND WELFARE OF THE CHILD UNDER THE PENNSYLVANIA ADOPTION ACT?

(Agency's Brief at 3).

¶ 5 We address the Agency's issues together. The Agency first urges that termination of Father's rights was proper under Section 2511(a)(5) and (a)(8) because Z.P. had been in foster care for 19 months by the time of the hearing, the conditions which led to placement continued to exist, and termination would best serve Z.P.'s needs and welfare. Specifically, the Agency avers: Father (1) questioned his paternity; (2) has never seen or called Z.P.; (3) failed to locate other family members who would actually visit with Z.P.; (4) did not attend parenting or substance abuse classes until June 2009; (5) did not provide any child support or gifts for Z.P.; (6) sent only one card to Z.P., (7) has had a long history of drug and alcohol abuse with related incarcerations, and (8) has limited employment options and no parole plan. The Agency contends termination of Father's parental rights is appropriate under subsections (a)(5) and (a)(8), despite the fact that Father has not actually had custody of or cared for Z.P.

¶ 6 The Agency also seeks reversal under subsections (a)(1) and (a)(2) in light of Father's life-long drug addiction, criminal

involvement, and repeated incarceration. This background suggests Father will have an "unpredictable and unsettled future path" without any assurances he will be able to provide a consistently safe and nurturing home for Z.P. The Agency highlights Father's dubious relationship with his other children, criticizing the court's failure to examine the evidence regarding Father's past parenting history.[1] Additionally, Father's refusal to release his mental health records to the Agency demonstrated questionable openness and commitment to the well-being of his son. Z.P.'s need for consistent stability and care should not be put on hold, where the Adoption and Safe Families Act ("ASFA") provisions emphasize "safety and permanency" according to particular time schedules. Although Father proposed his mother and ex-wife as possible kinship resources, the Agency found neither individual would be an appropriate placement. Specifically, Z.P.'s grandmother, Ms. Stephanie Bivens, "refused to make a long-term commitment to Z.P.," and failed to visit. Ms. Jill Bentley, father's ex-wife, also failed to visit Z.P. or follow-up with the Agency. Without familial resources, Z.P. will have to remain in foster care, and the Agency insists he should not be required to "languish" there. The Agency concludes the court erred in finding no grounds to terminate Father's parental rights under Section 2511(a).

¶ 7 Next, the Agency argues termination of parental rights would best serve the needs and welfare of Z.P. under Section 2511(b). The Agency notes the evidence of record shows terminating Father's parental rights would best serve Z.P.'s needs and welfare. The court acknowledged there was "no bond" between Father and Z.P. Additionally, psychologist Bruce Anderson determined Z.P. would experience severe trauma if he were removed from his foster home and placed with Father. The Agency maintains Z.P. is "definitely adoptable" and termination can offer Z.P. a more stable and secure home environment. The Agency concludes we should reverse the court's order refusing to terminate Father's parental rights. For the following reasons, we agree with the Agency's contentions.

¶ 8 Appellate review of termination of parental rights cases implicate the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re I.J.*, 972 A.2d 5, 8 (Pa.Super.2009) (quoting *In re S.D.T., Jr.*, 934 A.2d 703 (Pa.Super.2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. ... We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super.2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of wit-

---

1. Father has seven other children, who are not involved in the current proceedings.

(N.T. Hearing, 6/22/09, at 117, 152).

nesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super.2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super.2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super.2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[–92] (Pa.Super.2004).

*In re Adoption of K.J.*, 936 A.2d 1128, 1131–32 (Pa.Super.2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008).

¶ 9 The Agency sought the involuntary termination of Father's parental rights on the following grounds:

### § 2511. Grounds for involuntary termination

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, fur-

nishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\* \* \*

23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8); (b). Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions. *In re Adoption of R.J.S.,* 901 A.2d 502, 508 n. 3 (Pa.Super.2006).

¶ 10 A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition. *In re C.S., supra.* The court should consider the entire background of the case and not simply:

mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his ... parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.,* 856 A.2d 847, 855 (Pa.Super.2004), *appeal denied,* 582 Pa. 718, 872 A.2d 1200 (2005) (citing *In re D.J.S.,* 737 A.2d 283 (Pa.Super.1999)).

¶ 11 The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in *In re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2),

"the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley,* 719 A.2d 327, 330 (Pa.Super.1998).

¶ 12 The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." *In re A.L.D.,* 797 A.2d 326, 337 (Pa.Super.2002).

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. **This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.**

*In re E.A.P.,* 944 A.2d 79, 82 (Pa.Super.2008) (internal citations and quotation marks omitted) (emphasis added). Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). *In re Adoption of M.J.H.,* 348 Pa.Super. 65, 501 A.2d 648 (1985). *See also Matter of Adoption of C.A.W.,* 453 Pa.Super. 277, 683 A.2d 911, 916 (1996). "Parents are required to make diligent efforts toward the reasonably

prompt assumption of full parental responsibilities." *In re A.L.D., supra* at 340. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

¶ 13 Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child. *In re Adoption of Michael J.C.*, 506 Pa. 517, 525, 486 A.2d 371, 375 (1984). As our Supreme Court explained, if the statute required physical custody as a prerequisite,

> termination of parental rights would only result after a child has suffered physical, emotional or mental damage. We cannot agree. Neither the language of the Act, nor our case law, supports appellee's position that Section 2511(a)(2) requires a showing that a putative parent have an opportunity to inflict substantial physical or mental harm upon a child before the state can intervene. Rather, a more appropriate reading of the statute is that when a parent has demonstrated a continued inability to conduct his . . . life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

*Id.*

¶ 14 Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(5).

"[T]o terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275–76 (Pa.Super.2003); 23 Pa.C.S.A. § 2511(a)(8). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super.2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super.2003); *In re Adoption of M.E.P., supra.*

¶ 15 "The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super.2001).

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love,

protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his ... ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. **Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.**

*In re B., N.M., supra* at 855 (internal citations omitted) (emphasis added). *See also In re G.P.-R.,* 851 A.2d 967, 976 (Pa.Super.2004) (holding: "It is incumbent upon a parent when separated from his child to maintain communication and association with the child."). Additionally,

[t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re D.J.S., supra* at 286 (quoting *In re Adoption of Hamilton,* 379 Pa.Super. 274, 549 A.2d 1291, 1295 (1988)).

¶ 16 There also is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act ("ASFA"), the stated policy of which is:

[T]o remove children from foster placement limbo where they know neither a committed parent nor can [they] look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family.... States such as Pennsylvania, which participate in the program, are required to return the child to its home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the Adoption and Safe Families Act of 1997. Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is

contemplated this process realistically should be completed within 18 months. *In re G.P.-R., supra* at 975–76 (quoting *In re B.L.L., supra* at 1016).

¶ 17 In the case of an incarcerated parent, this Court has held:

the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his ... child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his ... children.

Where a non-custodial parent is facing termination of his ... parental rights, the court must consider the noncustodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the noncustodial parent and his ... child. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

Thus, a parent's basic constitutional right to the custody and rearing of his ... child is converted, upon the failure to fulfill his ... parental duties, to the child's right to have proper parenting and fulfillment of his ... potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.

*In re B., N.M.*, supra at 855–56 (internal citations and quotation marks omitted). Thus, the fact of incarceration alone neither compels nor precludes termination of parental rights. *In re D.J.S., supra* at 287. Parents must still provide for the emotional and physical well-being of their children. *In re Adoption of W.J.R.*, 952 A.2d 680, 687 (Pa.Super.2008).

¶ 18 The cause of incarceration may be particularly relevant to the Section 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were "part of the original reasons for the removal" of the child. *In re C.L.G.*, 956 A.2d 999, 1006 (Pa.Super.2008) (*en banc*). In the *C.L.G.* case, a mother was incarcerated on drug-related crimes, and this Court held,

if we were to permit [m]other further opportunity to cultivate an environment where she can care for [the child], we would be subjecting a child, who has been waiting for more than two years for permanency, to a state of proverbial limbo in anticipation of a scenario that is speculative at best. While it appears that [m]other has managed to remain drug-free in the confines of incarceration, whether she can maintain that status among the external pressures of the outside world remains to be proven. One can only speculate as to what the future conditions of [m]other's release from incarceration will entail and how soon she would be permitted to have supervised visits, let alone overnight visitation or full custodial care of a child she has never parented. In fact, if [m]other's life-long history of involvement with drug use and drug dealing bears upon her probability of success, she will face significant challenges in achieving a sober and productive lifestyle. More importantly, ... the likelihood of severe detriment to [the child],

if she were subjected to such a precarious re-introduction to Mother, could be devastating to her developmental well-being.

*Id.* at 1008 (discussing child who entered foster care placement four days after birth).

■■ ¶ 19 Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b). *In re D.W.*, 856 A.2d 1231, 1234 (Pa.Super.2004). In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S., supra* at 1202.

■■ ¶ 20 When conducting a bonding analysis, the court is not required to use expert testimony. *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super.2008) (citing *In re I.A.C.*, 897 A.2d 1200, 1208–09 (Pa.Super.2006)). Social workers and caseworkers can offer evaluations as well. *See In re A.R.M.F.*, 837 A.2d 1231 (Pa.Super.2003) (holding court properly terminated parental rights where decision was based in part on social worker's and caseworker's testimony that children did not share significant bond with biological parents and were well bonded with their foster parents). Additionally, Section 2511(b) does not require a formal bonding evaluation. *In re K.K.R.-S., supra.*

■■ ¶ 21 "Above all else ... adequate consideration must be given to the needs and welfare of the child." *In re J.D.W.M., supra.* A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re L.M.*, 923 A.2d 505, 512 (Pa.Super.2007).

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re C.S., supra* (emphasis added) (internal citations and quotation marks omitted).

■■ ■■ ¶ 22 "In the last sentence of subsection (b), we are instructed that we may not consider any effort by the parent to remedy the conditions described in subsections (a)(1), (a)(6) or (a)(8) if that remedy was initiated after the parent was given notice that the termination petition had been filed." *In re D.W., supra.* Further, this evidentiary limitation "applies to the entire termination analysis." *Id.* at 1234–35. The court, however, may consider post-petition efforts if the efforts were initiated before the filing of the termination petition and continued after the petition date. *Id.* at 1235 (discussing *In re K.C.W.*, 456 Pa.Super. 1, 689 A.2d 294 (1997)).

¶ 23 In the instant case, the court evaluated Father's case under Sections 2511(a) and (b) as follows:

The [A]gency's case against [Father] presents a ... difficult decision for the [c]ourt. The Agency argues termination of the parental rights of [Father] to Z.P. is proper under 23 Pa.C.S.A. 2511(a)(1), (2), (5), and (8)....

\* \* \*

This [c]ourt has serious reservations about allowing [Father] to retain his parental rights. [Father] has physical limitations which may impede his ability to care for a young child, in this case one that is only twenty months old. [Father] is currently serving a sentence for drug delivery. He has been incarcerated on at least two other occasions for drug related offenses and [perpetrated] domestic violence. He has admitted to having psychotic episodes while under the influence of drugs and alcohol. His ex-wife testified that he used drugs and alcohol. At the time of the hearing, [Father] was still under DOC supervision at Harrisburg but [might] be paroled upon approval of a home plan. The [c]ourt further acknowledges that there is absolutely no bond between [Father] and Z.P. as the two have never met because of [Father]'s incarceration.

\* \* \*

[Father] never saw Z.P. while he was incarcerated and as of the day of the hearing had never met Z.P. While [Father] was incarcerated, he requested monthly updates from Ms. [Minnier] and wrote her at least once a month to inquire about Z.P. He sent a birthday card and pictures of himself to Z.P. and requested the same. He testified that as soon as he was transferred to the Harrisburg facility he requested a visit with Z.P. He took all classes available to him in prison and continues to take classes. He attended ... permanency review hearings by telephone or in person. Those actions certainly weigh against termination of [Father]'s parental rights. In [the case of] *In re Adoption of M.T.T.*, [467 Pa. 88] 354 A.2d 564 (Pa. 1976) the Pennsylvania Supreme Court decided an involuntary termination case involving an incarcerated father. The Court found that father demonstrated his continued interest in maintaining a parental relationship with his child by his requests for information on all legal proceedings as well as statements to the agency regarding his desire to visit with and raise his child. The Court further found that the father made diligent efforts to locate his son by using the only means available to him. In finding that the father did not fail to perform parental duties, the Court stated, "appellant was facing a crisis situation while in prison and had no means to care for or support his child."

This [c]ourt faces a similar situation as the Court in *M.T.T.* There is no bond between [Father] and Z.P. There is a bond that has been forged between Z.P. and his resource parents as is evidenced by Z.P. running to them when his visits with [Mother] were over and by Mr. Anderson's testimony. [Father] being able to provide for the child's welfare and needs and his ability to forge a bond with Z.P. is merely speculative, while Z.P.'s welfare and needs are being met effectively by his resource family at this moment. Children need support and care from their parents and lack of such would weigh in favor of termination of a parent's parental rights. But how much care and support can the court expect from a parent who is in a crisis situation and whose child is at an age where he cannot speak to the parent, read the parent's letters or even recognize [the parent's] face? All the [c]ourt can expect of a [parent] in [Father]'s situation is that they utilize the programs available to them in prison, that they show a genuine interest in the safety and well-being of their child, they participate in any legal proceedings regarding their child and do all they can to be released from prison as early as possible in order to reunite with their child. All of these things are things that [Father] has done.

The [c]ourt is less than comfortable with allowing a disabled former habitual drug user and batterer to gain custody of a child, but the courts of this Commonwealth have been clear, if a parent does everything in their power under the law to care for their child, parental rights must not be terminated. It is clear from [Father]'s conduct since his incarceration that he has NOT evidenced a settled purpose of relinquishing his parental claim of Z.P. nor has he refused or failed to perform parental duties. Furthermore, this [c]ourt cannot definitively say that the conditions that led to Z.P.'s placement, as they pertain to [Father], exist today or will exist in the future. While this [c]ourt believes that Z.P.'s welfare and needs would most likely be best served by his staying with his resource parents or becoming adopted, that is simply not the standard the [c]ourt must follow. Until the Pennsylvania Supreme Court or legislature provides a different and hopefully bright line rule regarding an incarcerated parent['s] parental rights[,] this [c]ourt is constrained to hold as it does today. Therefore the [c]ourt finds the Agency has failed to prove by clear and convincing evidence that [Father]'s parental rights should be terminated.

(Trial Court Opinion, 6/26/09, at 7–11). The palpable conflict and error in the court's reasoning leads us to reject its decision under Section 2511(a)(2).[2]

¶ 24 Contrary to the court's conclusion, the evidence of record demonstrates Father is not capable of meeting the essential needs of a young child and will be unable to do so within a reasonable time. *See In re Adoption of Michael J.C.,* *supra; In re G.P.-R., supra.* The Agency presented uncontroverted evidence that Father is unavailable to take custody of Z.P. (N.T. Hearing, 6/22/09, at 25–26, 125–26, 138–39). As of the date of the hearing, Father was in pre-release status at Harrisburg Community Corrections, but had not paroled. (*Id.* at 75–76, 125). Although Father hoped he might soon be released and obtain his own residence, he testified his maximum sentence continued until 2018. (*Id.* at 151, 156). Department of Corrections counselor Michael Wilson could not provide an estimated release date and stated it could vary, depending on Father's ability to develop a home plan. (*Id.* at 76–77). Agency caseworker Crystal Minnier also testified Father would not be immediately ready to take custody of Z.P. (*Id.* at 25–26). Father admitted he did not know when he would be able to leave the pre-release center. (*Id.* at 125–26, 156, 138–39).

¶ 25 Assuming, for the sake of argument, Father's imminent release on parole, his ability to assume custody of Z.P. is

---

**2.** An *en banc* panel of this Court has held Sections 2511(a)(5) and (a)(8) do not apply when a natural father is incarcerated and has had no custody of the child. *In re C.S., supra* at 1200. Because the child had never been in the father's care, the child could not technically have been removed from the father's care. *Id.*

Instantly, the record makes clear that but for the wording of these subsections, the Agency presented clear and convincing evidence to terminate Father's parental rights under both subsections 2511(a)(5) and (a)(8). Z.P. has been in foster care for more than twelve months, and the conditions which led to his placement continue to exist. The evidence shows Father does not have the capacity to undertake his parental role at this time. We note, however, the similarity of the present case to *In re C.S.,* regarding the child's removal from Father's care. We agree with the trial court, therefore, that termination is not proper under subsections (a)(5) and (a)(8). The wording of the statute actually creates a perverse protection to parents who have failed to undertake any custodial responsibilities.

speculative at best. Father's January 2009 Family Service Plan ("FSP") goals included, *inter alia*, the following objectives:

- [Father] will remain free 100% of the time from all substance abuse to provide appropriate care for [Z.P.].
- [Father] will not associate with anyone who has active substance abuse issues.
- [Father] will cooperate with random urinalysis to monitor compliance with abstinence from drugs and alcohol.
- [Father] will develop a budget that demonstrates an ability to pay for rent, utilities, food and clothing.
- [Father] will maintain a clean, safe home free of any potential safety hazards. This includes no drugs or alcohol in the home or people who frequent the home with substance abuse issues.
- [Father] will obtain a safe and affordable living arrangement for [himself] and [Z.P.]. Will create a budget and follow consistently to provide for basic needs and avoid eviction.
- [Father] will sign all releases deemed appropriate.
- [Father] will not continue to be involved in illegal activity.

(Family Service Plan, Agency Exhibit 27). During a January 2009 permanency review, the court found Father had moderately complied with the permanency plan, in that Father maintained monthly contact with the agency through correspondence. (Permanency Review Order, Filed 2/6/09, Agency Exhibit 26). Father's correspondence with the Agency has little bearing on his inability to meet his other FSP goals. The Agency, for example, asserted it would have to evaluate Father's capacity to maintain a home free of drugs and alcohol, "as he has not been successful in the past." (Agency Exhibit 27, *supra*). At the termination hearing, Father's future with respect to adequate housing and employment was completely indefinite. Father said he intended to return to college and eventually work as a drug and alcohol counselor, but he had not yet filed any school applications. (N.T. at 135, 151). Father also suggested some kind of interim employment, "teaching computers or something." (*Id.* at 158). During Father's incarceration, he received Social Security Disability payments due to issues with his knee, but made no arrangements for any of the payments to go for Z.P.'s benefit. (*Id.* at 151–52, 154–55). Father claimed, without any explanation, that he was unable to support Z.P. while Father was incarcerated. (*Id.* at 155). Regarding housing, Father stated he wanted to move back to Williamsport, Pennsylvania, but he was unsure whether he would live by himself or with his ex-wife. (*Id.* at 126).

¶ 26 Father's declared resolve to parent Z.P. is doubtful, given his past parenting history while not incarcerated. *See In re C.L.G., supra.* Father testified he is in contact with all of his minor children, but his parenting history was necessarily limited by his significant drug and alcohol addiction, perpetration of domestic violence, psychotic episodes, arrests, one parole violation, and multiple incarcerations since 2000. (*Id.* at 23, 48, 113–115, 125, 130, 141, 143, 148–49, 152–56). Father could not even estimate the amount of time he was using drugs. He stated only that he "went on binges." (*Id.* at 149). Father asserted his hallucinations were solely drug-induced and, given his sobriety, no longer an issue; but these episodes were persistent enough that he was initially assigned Social Security Disability benefits on this basis. (*Id.* at 149–152). The Agency was unable to confirm the resolution of Father's mental health issues because Father refused, upon his attorney's advice, to sign forms releasing his mental health records to the Agency. (*Id.* at 130–31, 150–51).

¶ 27 Father's repeated drug use and criminal activity within the past nine years occurred despite the existence of his other children. These decisions show a pattern of incapacity to parent, particularly while not incarcerated. *See In re C.L.G., supra* at 1008 (considering mother's life-long drug use in evaluating her probability of parenting success post-incarceration); *In re Adoption of W.J.R., supra* (holding father's repeated pattern of criminal activity and failure to comply with FSP goals satisfied requisite incapacity, abuse, neglect or refusal to parent); *In re E.A.P., supra* at 83 (terminating parental rights because mother's repeated incarcerations indicated she did not have capacity to parent due to "inability to remain present in [child's] life"). Father's history makes clear he is unavailable to provide a child with "love, protection, guidance, and support." *See In re B., N.M., supra* at 855. Therefore, while Father has been somewhat proactive during his incarceration, competent evidence of record supports Ms. Minnier's concerns Father would not be able to maintain his sobriety or properly care for Z.P. upon release. (N.T. at 24–26). *See C.S., supra* at 1201 (holding parent's "patent inability to forswear his criminal activities and stay out of trouble," supports terminating parental rights due to failure to perform parental duties under subsection (a)).

¶ 28 Father's recent efforts to straighten out his life do not require that Z.P. be put in harm's way or indefinitely postpone adoption. *See In re Adoption of Michael J.C., supra* at 525, 486 A.2d at 375 (refusing to grant parent "opportunity to inflict substantial physical or mental harm upon a child before the state can intervene"); *In re Z.S.W.,* 946 A.2d 726, 732 (Pa.Super.2008) (holding child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting"). Father

cannot produce a viable kinship option to take care of Z.P. during Father's transition. Of the two proposals, Z.P.'s grandmother was not interested in taking custody and never visited with Z.P., despite agency efforts to coordinate contact. (N.T. at 20–21, Agency Exhibit 55). Ms. Minnier testified Father's ex-wife expressed a similarly lukewarm interest in Z.P., offering to serve as a resource if "things fall through with the grandmother." (N.T. at 21). In fact, Ms. Minnier expressed her concerns directly to Father, by letter dated July 2008. (Agency Exhibit 55). Ms. Minnier explained Ms. Bentley is not a relative of Z.P., and the fact that Father and Ms. Bentley obtained a divorce and are now again engaged suggests "a lack of stability" in their relationship. *(Id.)* The Agency would need to observe a period of time where Ms. Bentley and Father could maintain a stable relationship before it would consider her for kinship care. *(Id.).*

¶ 29 Z.P., therefore, would have to remain in foster care until some speculative point in the future before Father could care for him. *Compare In re I.G.,* 939 A.2d 950, 954 (Pa.Super.2007) (refusing to terminate parental rights where father proactively identified appropriate kinship placement with paternal aunt and uncle). Pennsylvania law does not compel this result just because an incarcerated parent participates in prison programs, shows interest in his child, participates in legal proceedings, and works toward early release from prison. The complete circumstances of the case must be considered. Z.P.'s need for consistency and stability cannot be ignored, merely because Father is "doing what [he] is supposed to do in prison." *See In re E.A.P., supra* at 82, 84. To the contrary, the ASFA-related policies now demand reasonable efforts within a reasonable time to remedy parental inca-

pacity. Z.P. has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification. *See id.; In re G.P.-R., supra* (holding ASFA requires agency to work toward termination of parental rights after child has been in foster care for 18 months). Father's overall parenting history revealed no genuine capacity to undertake his parental responsibilities, and the Agency's evidence was sufficient to terminate his parental rights under subsection (a)(2). *See In re A.P.,* 728 A.2d 375, 379–80 (Pa.Super.1999), *appeal denied,* 560 Pa. 693, 743 A.2d 912 (1999) (holding child's rights must prevail over parent's, where parent cannot meet his "irreducible minimum parental responsibilities").

¶ 30 Therefore, we conclude clear, convincing, competent evidence of record supports termination of Father's parental rights under Section 2511(a). *See In re B.L.W., supra.* The trial court erred when it held Father's efforts were the only determinative factors at issue.[3] *See In re Adoption of Michael J.C., supra* (stating: "a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties"); *In re A.L.D., supra* at 337; *In re Adoption of M.J.H., supra.*

¶ 31 The record, however, supports the court's Section 2511(b) findings that (1) there was "absolutely no bond" between Father and Z.P., *see In re L.M., supra,* and (2) remaining with his foster parents or being adopted would best serve Z.P.'s needs and welfare. *See In re J.D.W.M., supra.* Psychologist Bruce Anderson's testimony demonstrated that, due to Z.P.'s young age, locating a permanent and stable home for Z.P. as soon as possible would best serve his interests. (N.T. at 59–60, 64–65, 68–69). He explained that allowing Z.P. to continue residing with his foster family will strengthen his bond to them, making a later separation even more traumatic. (*Id.* at 59–60, 68–69). Mr. Anderson also testified it was his professional opinion there would be no negative impact on Z.P. if the court severed Father's parental tie. (*Id.* at 59, 64). Father's brief does not even contest this issue, stating it was "virtually impossible" for Z.P. to bond with Father due to the lack of visitation. (Father's Brief at 10). Both Mr. Anderson and Z.P.'s court-appointed special advocate, Ellen Derr, testified as to the positive relationship between Z.P. and his resource parents. (N.T. 58, 92–94).

¶ 32 Based upon the foregoing, we hold clear and convincing evidence demonstrated grounds to terminate Father's parental rights under Section 2511(a) and (b),

---

3. The court noted it was constrained by the holding of *In re M.T.T.'s Adoption, supra,* but the facts of the current case are distinguishable. In *M.T.T.,* the agency intentionally obstructed the father's contact with his child by ignoring the father's requests for information. *Id.* at 97, 354 A.2d at 568–69.

Instantly, there is no evidence the Agency improperly interfered with Father's contact with Z.P.: Caseworker Crystal Minnier provided Father with monthly updates, including pictures and information on Z.P.'s medical and developmental progress. (N.T. at 132, Agency Exhibit 38, 40, 46, 49, 55, 60, 64–66, 70, 82, 83, 84–85). She also advised Father regarding steps he should take to maintain his parental rights. (*Id.*). Additionally, Heather Wood, the Agency's visitation coordinator, testified that visits with Z.P. were available if Father could have arranged for transportation to Z.P. The trip was determined to be too long for Z.P., and there were inappropriate visitation facilities at the prison. (N.T. at 84, 86–87, 89). Contrary to the court's position that it faced a similar situation as *In re M.T.T.,* the facts of the present case are distinguishable and serve to illustrate that the *M.T.T.* result is not compelled here.

where (1) Z.P. has already been in foster care for two years; (2) Father's ability to care for Z.P. and remain available to Z.P. is entirely speculative and will take significant additional time to establish; (3) Father has identified no viable kinship care options; and (4) immediate permanency would best serve Z.P.'s needs and welfare. On these facts, the law does not require Z.P. to remain in foster care, against his best interests, just to serve Father's wishes. *See In re B., N.M., supra* at 855–56. Accordingly, we reverse the order denying the Agency's petition and remand with instructions to terminate Father's parental rights.

¶ 33 Order reversed; case remanded. Jurisdiction is relinquished.