J-S19002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: RELINQUISHMENT OF: S.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 130 MDA 2024 |

Appeal from the Order Entered January 3, 2024
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  2023-00056

BEFORE:   DUBOW, J., BECK, J., and COLINS, J.[*]

MEMORANDUM BY DUBOW, J.:          **FILED: JULY 31, 2024**

Appellant, B.H. ("Mother"), appeals from the January 3, 2024 order entered in the Lackawanna County Orphans' Court that involuntarily terminated her parental rights to four-year-old S.M. ("Child").[1]  Upon careful review, we affirm.

The relevant factual and procedural history is as follows.  On July 17, 2020, the Office of Youth and Family Services ("the Agency") took emergency custody of Child and his two older siblings after police served a warrant on Mother's paramour in the apartment where they both lived and found methamphetamine, marijuana, and a gun, and police proceeded to condemn

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child's biological father, P.G., and Child's legal father, J.H., both signed a voluntary termination of their parental rights to Child.  Neither are a party to this appeal.

the home. Additionally, Mother tested positive for methamphetamines, marijuana, suboxone, and benzodiazepine.

The Agency placed then-eight-month-old Child in a pre-adoptive foster home that was able to attend to Child's urgent medical needs, including administering a suppository to control Child's seizure disorder. Additionally, the foster parents treated Child for head lice, updated Child's immunizations, and followed up with Child's pediatric neurologist and pediatrician to obtain necessary prescriptions. Child's older siblings were placed in a separate home.[2]

On July 27, 2020, the trial court adjudicated Child dependent and ordered the Agency to retain legal and physical custody of Child. The court approved an initial Family Service Plan ("FSP") that established objectives for Mother, including: 1) engage in drug and alcohol treatment; 2) address mental health issues; 3) attend parenting classes, specifically Mother's Group; 4) obtain safe and stable housing; 5) obtain employment; 6) pay household bills and utilities; and 7) create a safe and nurturing environment for Child. The Agency created a total of seven FSPs for Mother. During the entire review

---

[2] The trial court provides a thorough and accurate procedural and factual history as it relates to Child's older siblings. *See* Trial Ct. Op., 2/26/24, at 7-9. Relevant to this appeal and by way of background, the siblings were 4 and 5 years old at the time they were removed from Mother's care; they did not have any special medical needs; they were placed in more than seven failed foster home and kinship placements; they had a failed reunification attempt with their biological father; they exhibit a parent-child bond with Mother; and they were eventually reunited with Mother in May 2023.

period, Mother never exceeded moderate FSP compliance or moderate FSP progress with regards to Child.

Mother successfully completed drug and alcohol treatment on August 11, 2022, although she continued to use marijuana for anxiety after obtaining a medical marijuana card. The medical marijuana card expired in July 2023, but Mother continues to use marijuana, purchasing it illegally.

Mother was less successful in completing her remaining objectives. Mother is diagnosed with bipolar disorder. In July 2020, the Agency referred Mother to Scranton Counseling Center for mental health treatment. In January 2022, Mother began mental health treatment at Scranton Counseling Center but attended appointments inconsistently and refused to take her prescribed medication regularly. Mother was eventually discharged without completing treatment. In June 2022, Mother began attending Omni for mental health treatment, where she was required to sign an attendance contract after exhibiting inconsistent attendance. Mother failed to attend consistently and was subsequently discharged for non-compliance. Additionally, Mother failed to comply with her parenting objective by attending Mother's Group and informed the trial court that she refused to attend Mother's Group. Mother also failed to obtain adequate housing: she lives in a studio apartment with her paramour and Child's older siblings that, by Mother's own admission, does not have enough space for Child.

Mother has been consistent with visitation. Initially, visits were supervised in the Agency offices and eventually moved to the community.[3] In March 2022, Mother's paramour was released from prison and began attending the visits. In June 2022, Mother and her paramour began having unsupervised visitation in the community with Child. In October 2022, Mother progressed to unsupervised visitation in her home. During this time, after unsupervised visitation began, then-two-year-old Child began exhibiting aggressive behavior issues including anger outbursts, defiance, crying, hitting people, and other attention-seeking behaviors. In November 2022, Child reported to Mother that someone had hit him; Mother reported the disclosure to the Agency. Child told an Agency social worker that it was Mother's paramour who had hit him. The Agency suspended visitation during its investigation. In January 2023, the Agency deemed the report unfounded and resumed supervised weekly visitation, which occurs to date for two hours per week supervised by Outreach Center for Community Resources.

On November 8, 2023, the Agency filed a petition to involuntarily terminate Mother's parental rights to Child. The trial court held a hearing on December 18, 2023.[4] The trial court heard testimony from Jennifer Dunston, Agency social worker; Virginia Haynes, foster mother; and Mother.

---

[3] Due to COVID-19 some visits during this time were virtual.

[4] George Mehalchick, Esq., served as Child's legal counsel and guardian *ad litem* ("GAL").

Ms. Dunston testified in accordance with the above-stated facts. Additionally, Ms. Dunston testified that Child calls his foster parents Mommy and Daddy and is "very, very bonded to them and their daughters as well." N.T. - AM Hearing, 12/18/23, at 74. She explained that Child is very attached to his foster parents and looks to them for all his need and wants. Ms. Dunston testified that Child calls Mother "Mom [B.H.]" and refers to her and his older siblings as his "friends." *Id.* at 32.

Ms. Haynes testified that Child has lived with her and her husband for the past 41 months and is thriving. She explained that they have strived to meet all of Child's medical needs and that he has only had one seizure under their care and has been weaned off all his seizure medication. Ms. Haynes testified that Child participates in physical, speech, and music therapy, has made great strides, and is currently meeting all his developmental milestones. Ms. Haynes stated that Child has been diagnosed with both mood and adjustment disorders. Ms. Haynes has also worked with a behavioral health specialist to help redirect Child and promote less aggressive behavior. Ms. Haynes testified that "[m]y husband and I have poured in 110 percent, you know, with whatever [Child] needed, with whatever he needed. From therapy to love[.]" *Id.* at 82.

Mother testified that there was some "neglectfulness" and that she previously had a drug problem but that she has "addressed that and changed myself." N.T. - PM Hearing, 12/18/23, at 10. Mother explained that she has completed drug and alcohol treatment and has been clean from

methamphetamine for several years. Mother admitted that she still uses marijuana several evenings per week for anxiety and purchases it illegally since her medical marijuana card expired in July 2023. Mother admitted that she stopped attending mental health treatment and that she refuses to attend the parenting class required by her FSP, *i.e.*, Mother's Group.

Mother testified that she is aware that she is supposed to participate in mental health treatment and parenting classes, but she is choosing not to. Mother testified that even through the Agency social worker explained that she must complete her FSP objectives, she believes that housing is the only barrier to reunification. Mother explained that her current studio apartment that she shares with her paramour, Child's two older sisters, a dog, and a cat is too small to accommodate Child. Mother stated that she applied for larger housing and hopes that it will be available soon. Mother explained that she repeatedly asked the Agency to increase visitation and allow Child to have more visitation with his older siblings. Mother stated that Child's siblings love him and demonstrate that during visits. Mother testified that she loves Child and wants him to know that she is fighting for him.

At the conclusion of the hearing, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). Child's GAL agreed with this disposition.

Mother timely appealed. Both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues for our review:

A. Whether the trial court erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its burden of proving the termination of Mother's parental rights is warranted under Sections 2511(a)(1), 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

B. Even if the Court concludes the Agency established statutory grounds for the termination of Mother's parental rights, whether the trial court nevertheless erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its additional burden of proving the termination of Mother's parental rights is in the best interests of the Child?

Mother's Br. at 5 (some capitalization omitted).

## A.

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody[,] and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d

1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on subsection 2511(a)(2).

**B.**

In her first issue, Mother avers, *inter alia*, that the trial court abused its discretion when it terminated her parental rights pursuant to Section 2511(a)(2). Mother argues that "the trial court failed to logically distinguish the difference between the divergent paths taken by Child to termination versus [his] sisters who remain reunified with Mother." Mother's Br. at 14. Mother asserts that the trial court found Mother to have substantial compliance and progress with regards to Child's siblings for identical FSP objectives and argues that the "only reason Child was not included on the

reunification tract with [his] sisters was because Mother did not have a big enough residence." *Id.* at 13-14.

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015), *abrogated on other grounds by In re K.T.*, 296 A.3d 1085 (Pa. 2023). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010).

Finally, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *Id.* at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care,

- 10 -

control or subsistence necessary for his physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." ***Id.*** (citation omitted).

Applying these principles, the trial court concluded that Mother's refusal to consistently participate in services and failure to make progress towards the completion of her FSP objectives has prevented Mother from providing essential parental care to Child. Despite Mother's contentions that her only barrier to reunification is housing, the trial court placed great weight on Mother's refusal to participate in mental health treatment or parenting classes and the fact that Child has been in placement for forty-one months. The trial court opined:

> During the review period, [M]other has never received a rating above moderate for either compliance or progress. [Mother] has never attended Mother's Group. [Mother]'s history with mental health services was inconsistent during the review period, as she did not attend Scranton Center regularly or take her medications as prescribed. [Mother] then changed mental health providers to Omni and had to sign an attendance contract as she had continuous absences. [Mother] was then discharged unsuccessfully from Omni. Although [Mother] for a time had a medical marijuana card, she continued to use illegal substances even after the card expired. [Mother] has failed to obtain proper housing under the FSP. . . . The court finds the Agency has met its burden of establishing by clear and convincing evidence that [Mother]'s conduct warrants termination of parental rights.

Trial Ct. Op. at 13-14.

Our review of the record supports the trial court's findings, and we decline to reweigh the evidence or usurp the trial court's credibility determinations. Mother's own testimony is compelling. By her own

admission, Mother refuses to consistently engage in services and, therefore, has failed to complete her FSP objectives. Mother's refusal has prevented reunification with Child and, therefore, rendered her incapable of providing essential parental care to Child. Accordingly, we find no abuse of discretion.

Mother's argument that the trial court failed to consider that Child's siblings reunified with Mother is belied by the record. The trial court placed great weight on the fact that Child's siblings were returned to Mother but distinguished Child's circumstances from his sibling's circumstances. The trial court opined:

> It is also significant that [Mother] has done tremendous work in re-gaining custody of her two other minor children, however this court finds their situation to be vastly different than [Child]'s. In evaluating the petition to terminate [Mother]'s parental rights, this court recognizes the vastly different paths [Child] and his two sisters have been on was unavoidable and directly contributed to the different outcome.

Trial Ct. Op. at 14. The trial court credited Ms. Dunston's testimony that Mother refused to comply with mental health services and parenting classes to facilitate reunification with Child and concluded:

> Although this court notes that there has been some improvement by [Mother] recently, [Mother]'s conduct over the total 41[-] month review period [that Child] has been in non-kinship foster parents' [care] must be evaluated. This court finds the testimony from [Ms.] Dunston to be compelling and credible. The court finds the Agency has met its burden of establishing by clear and convincing evidence that Mother's conduct warrants termination of parental rights.

*Id.* at 14. While Mother argues that it is not "logical" for Child to be on a different path from his siblings, she fails to provide any legal authority to support her assertion that the trial court erred. The record supports the trial court's findings and we find no abuse of discretion.

**C.**

In her next issue, Mother avers that the Agency failed to establish by clear and convincing evidence that termination would be in Child's best interest. Mother's Br. at 17. Mother concedes that Child is bonded to his foster parents but argues that it is because the Agency only offered Mother a "limited amount of meaningful visitation." *Id.* Mother further argues that the trial court failed to consider the consequences of severing the bond between Child and his siblings. *Id.*

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing

any such bond." ***In re Adoption of N.N.H.***, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. ***In re A.D.***, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. ***Id.*** at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. ***Z.P.***, 994 A.2d at 1121.

Instantly, the trial court found that terminating Mother's parental rights was in Child's best interest. Our review of the record reveals that Mother's own testimony supports the conclusion that Child has a strong parent-child bond with the foster parents when she stated, "I can understand why he bonded with [foster mother] because she is with him 24 hours." N.T. PM Hearing, 12/18/23, at 20-21. The court also credited Ms. Dunston and Ms. Haynes's testimony that Child looks to his foster mother to have his needs met, calls foster parents "Mommy" and "Daddy," and refers to the foster parent's biological children as his siblings. Trial Ct. Op. at 15. With regards to his relationship with his own siblings, the court credited Ms. Dunston's testimony that Child thinks of Mother and his siblings as "friends." ***Id.*** The trial court emphasized that Child began to exhibit aggressive behaviors after

beginning unsupervised visitation with Mother. *Id.* Ultimately, the court found that there is not a bond between Child and Mother. *Id.*

In contrast, the court concluded that Child is "thriving" in the foster home where he has been weaned from all seizure medication and receives therapy for his behaviors. *Id.* The court concluded that severing Child's bond with his foster family would be detrimental to Child. The court opined:

> This court finds a strong, enduring bond exists with foster family and has persisted over the past three and a half years. Thus, to sever the bond at this late stage would have a disastrous and traumatic impact on this now almost five-year-old child. This court is satisfied that the minor child is thriving in a loving, stable and permanent home.

*Id.* Finally, the court placed great weight on the GAL's recommendation that termination of parental rights would be in Child's best interest, emphasizing that "[t]he guardian recommended that termination of parental rights would be in the best interest of the child, as permanency and medical care for the child are paramount in this case." *Id.* at 16. Crediting the testimony of Ms. Dunston, Ms. Haynes, and the recommendation of the GAL, the trial court found that "termination of parental rights would best serve [C]hild's best interests." *Id.* As the record supports the trial court's findings, we discern no abuse of discretion.

**D.**

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial

- 15 -

court's conclusion that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(a) and (b).

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/31/2024