J-A09021-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1223 WDA 2020 |

Appeal from the Order Entered October 15, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-011-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1224 WDA 2020 |

Appeal from the Order Entered October 15, 2020
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  CP-02-DP-0000807-2017

BEFORE:   STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: JUNE 8, 2021**

In this consolidated matter, the Allegheny County Office of Children, Youth and Families (CYF) appeals the trial court's order denying CYF's petition to involuntarily terminate the rights of H.H. (Mother) pursuant to the Adoption Act. **See** 23 Pa.C.S.A. § 2511.  While the court determined CYF established

---

[*] Retired Senior Judge assigned to the Superior Court.

grounds for termination under Section 2511(a), the court found CYF failed to establish that termination best served the needs and welfare of seven-year-old C.D. (Child) under Section 2511(b).[1]  CYF also appeals the trial court's subsequent decision to change the goal of Child's dependency proceedings to permanent legal custodianship, pursuant to the Juvenile Act. **See** 42 Pa.C.S.A. § 6351(f).[2]  After careful review, we affirm.

The facts pertinent to our disposition are these:  Child was born in 2013 in Tennessee.  He tested positive for illicit drugs at birth, and the local social services agency removed Child from Mother's care.  While in Tennessee, Child was placed with Maternal Grandmother and in foster care.  The family eventually relocated to the Pittsburgh area.

The family came to the attention of CYF in the summer of 2017, when Child was four years old, after Mother had several incidents involving the police.  Following one such incident, Mother was admitted to the hospital where she tested positive for benzodiazepines and cocaine.  CYF obtained an emergency custody authorization and placed Child into the foster home where he now resides.

_____

[1] We observe the court also terminated the rights of C.A.D., who was married to Mother at the time of Child's birth, but whose biological parentage was ruled out by genetic testing.  CYF also filed a termination petition against the unknown father, which the court granted.  These terminations were not appealed.

[2] Child also appeals the court's denial of CYF's termination petition, though not the goal change. **See** 1225 WDA 2020.  Child's appeal is separately listed before this panel.

Mother stipulated to a dependency adjudication in July 2017. The court ordered a family service plan to aid Mother's reunification with Child. The goals of the reunification plan included, *inter alia*, housing, mental health treatment, and visitation; but the primary goal was Mother's sobriety. Between July 2017 and August 2020, the court conducted permanency review hearings approximately every three months.

The trial court found Mother's overall compliance with the family service plan to be moderate, and that Mother's progress ebbed and flowed. Specifically, Mother completed therapy, obtained housing, and managed her medication during the dependency case. Because Mother had achieved sobriety for months at a time, the court ordered substantial visitation, including overnights and unsupervised visits. At one point, those visits occurred at least three days per week.

However, Mother's progress was always impeded by drug relapses. And apart from her substance abuse issues, Mother's ability to parent was also impeded by her mental health issues; she was diagnosed with borderline personality disorder and bipolar disorder. The court also observed tensions between Mother and the foster mother, who alleged Child was mistreated by Mother; the allegation was eventually deemed unfounded. Mother requested that CYF pursue placement options with Mother's family in Alabama. The court ordered CYF to submit an interstate compact to pursue these options, but Mother's family ultimately decided not to make themselves a placement option.

Child displayed behavioral issues when he was initially placed with the foster family, but after therapeutic intervention Child did well in their care. Over the course of the dependency case, the court ordered several evaluations with psychologist Beth Bliss, Ph.D.  Eventually, CYF petitioned for the involuntary termination of Mother's rights in January 2020.  Meanwhile, with the onset of the Covid-19 pandemic, the visits became virtual.  The hearing was twice continued before the court ultimately held the proceeding on October 15, 2020, approximately 39 months after the court adjudicated Child dependent.

At the conclusion of the termination proceeding, the court determined CYF met its burden under Section 2511(a) of the Adoption Act – the first step of the bifurcated analysis.  However, the court concluded CYF had not demonstrated that termination would best serve Child's needs and welfare under Section 2511(b).  In reaching this determination, the court relied largely upon the expert testimony of Dr. Bliss.  The court denied CYF's termination petition.  Immediately following the termination proceeding, the court conducted a permanency review hearing pursuant to 42 Pa.C.S.A. § 6351.  By agreement of the parties, the court incorporated the testimony of the termination proceeding into its permanency review.  The court then changed the goal to subsidized permanent legal custodianship. CYF timely filed this appeal.

CYF presents the following issues for our review:

1. Did the trial court err as a matter of law and/or abuse its discretion when it denied CYF's petition to involuntarily terminate the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(b) after CYF proved by clear and convincing evidence that termination of Mother's parental rights would best serve the developmental, physical and emotional needs and welfare of [] Child.

2. Did the trial court err as a matter of law and/or abuse its discretion in changing the permanency goal to permanent legal custodianship in this case, after CYF proved by clear and convincing evidence that the goal of adoption is best suited to [Child's] safety, protection and physical, mental and moral welfare?

CYF's Brief at 4 (capitalization adjusted).

We begin with the termination question, mindful of our well-settled standard of review of such cases:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

- 5 -

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.,* 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Here, the trial court found that statutory grounds for termination existed under Section 2511(a)(2), (5), and (8). Mother did not appeal that finding, and thus the first step of the bifurcated analysis is undisputed. The issue here is whether CYF met its burden under Section 2511(b), which states in relevant part:

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. […].

23 Pa.C.S.A. § 2511(b).

This Court has explained that:

[S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that

- 6 -

bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (Observing the "immutable psychological truth" that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent."); *and see K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). We add, the court is not required to use expert testimony to resolve the bond analysis but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Finally, we emphasize that "[w]hile a parent's emotional bond with her and/or her child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

In the instant matter, the court noted two primary reasons for denying termination under Section 2511(b): the court found compelling the expert

testimony of Dr. Bliss, who did not recommend termination; and the court found lacking the evidence offered by CYF in favor of termination.

Dr. Bliss testified that the foster home provided Child with a safe, positive placement, where Child's needs were met. She also stated that removing Child from the foster home would cause the same negative effects as severing the parental bond between Mother and Child. Dr. Bliss ultimately opined that termination would not be in Child's interests, and she recommended permanent legal custodianship. *See* N.T., 10/15/20, at 78-79. She explained why the best situation for Child would be to stay in the foster parents' care, while having ongoing contact with Mother:

> So with children, obviously we don't know what will happen, but we know what research shows can happen to children. So with children who have a strong bond or attachment and that is severed, whether that be through death or termination of parental rights or a parent leaving and never having contact with the child again, it can do multiple things. It can have impact on future behavioral issues, emotional issues. There is that sense of parental rejections or potential internal blame for that. In addition to that, it can have impact on how they attach or relate to people later in life. That is much more the case for younger children, but with [Child] **he has a strong positive bond** with [Mother] and she was initially his primary attachment. He's obviously formed a strong primary attachment now to [the] foster parent as well. But severing that relationship could impact his ability to attach or relate to others later in his life.

*Id.* at 89 (emphasis added).

Dr. Bliss testified that Child turned to Mother for comfort and "as his secure home base, which you'll see in children with attachments." *Id.* at 93; *see also id.* at 70. She also testified that Child was protective of Mother. *Id.*

at 70. Dr. Bliss explained how she witnessed the strength of the parental bond: "My opinion is that their bond is strong enough and in place enough. […] It's there. It's stable. It's consistent. It hasn't been impacted by the fact that they weren't having in-person visits [due to Covid-19 precautions]." **Id.** at 92.

Thus, relying on the testimony of Dr. Bliss, the court explicitly found that the bond between Child and Mother was positive, and that Mother was a source of comfort and security for Child. The court also found that this bond was so beneficial, that its severance would be destructive. Although Mother's inability to parent meant that she might not be able to serve Child's physical needs, the court found the bond between them served Child's emotional needs, which are also necessary to development and welfare.

Not only did the trial court find the testimony of Dr. Bliss to be persuasive, but the court also determined, by contrast, that CYF failed to meet its evidentiary burden. **See** T.C.O., 12/14/20, at 18. The court noted CYF did not offer any witness testimony to contradict Dr. Bliss's expert opinion. The caseworker did not testify to his observations between Child and Mother or between Child and the foster parents. CYF did not call other witnesses who might have testified about the bond. No one asked the foster parent about the foster family's relationship with Child, or what they observed between Child and Mother. No one called Child's therapist to testify about the relationship Child had with Mother and the foster parents. **See id** at 25-26**.**

On appeal, CYF concedes that the reason the court denied the termination of parental rights petition was based on the bond between Mother and Child. CYF does not dispute that bond. *See* CYF's Brief at 19. Rather, CYF argues that Child's need for permanency and security, which could only be achieved through adoption, should outweigh concerns about the severance of the bond. *See id.*, 17, 19.

CYF explains that Dr. Bliss's recommendation against termination was predicated on the understanding that Child and Mother would have ongoing contact. However, CYF maintains that ongoing contact is far from guaranteed, given Mother's struggles with addiction and mental health. Thus, if the foster parents felt compelled to stop unhealthy contact between Mother and Child, then the primary reason against termination would be undermined.

Along the same lines, CYF explains that Dr. Bliss's recommendation was also based on Child's need for finality, that prolonged litigation would adversely affect Child's stability and permanency. *Id.* at 20 (citing N.T. at 78). CYF warns that Mother had a basic misunderstanding of the case, that she wrongly believed she would soon be able to care for Child. And thus, because permanent legal custodianship allows Mother to petition the court for reunification, litigation involving Child will not necessarily cease. CYF concludes the court should have recognized that Mother and the foster family could have entered into an open adoption agreement under 23 Pa.C.S.A. § 2731, thereby providing Child with ongoing contact with Mother.

We understand CYF's arguments. If either of those hypotheticals ever come to pass, then Child might be left without the ongoing contact imagined by the permanent legal custodianship, while also being left without the permanency afforded by termination. In this worst-of-both-worlds situation, it might appear that termination was the better choice after all. But that would only be apparent in hindsight. In essence, CYF's alleged error is that the trial court did not hedge for the future. We fail to see how this could be a basis for reversal.

For instance, in *In re Adoption of G.L.L.*, 124 A.3d 344 (Pa. Super. 2015), we were not persuaded by unknown, future possibilities when reviewing the trial court's denial of the termination petition. There, the psychologist did not recommend reunification. Instead, the psychologist recommended continuing the relationship between the mother and child through an open adoption. *G.L.L.*, 124 A.3d at 348. The trial court concluded termination did not serve the child's interests under Section 2511(b). On appeal, we noted that parties could not effectuate an open adoption until after the termination. We affirmed the trial court, holding "we do not find that the uncertainty of an open adoption is appropriate or relevant in a termination analysis under Section 2511(b)." *Id*. (citing *In re K.H.B.*, 107 A.3d 175, 184 (Pa. Super. 2014)).

Importantly, we also observe that discretion is not abused merely because the record also supports a different outcome. *See J.M*, 991 A.2d at 324. Put simply, the court's decision was not "manifestly unreasonable." *See*

- 11 -

*id.* The court's bond determinations were supported by the record, and the court did not err when it concluded CYF provided insufficient evidence to support its petition. CYF's first issue is without merit.

Next, we consider CYF's second appellate issue: whether the trial court erred by changing the goal from reunification to permanent legal custodianship. Like termination decisions, we review goal changes for an abuse of discretion:

> We must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In re W.M.*, 41 A.3d 618, 623 (Pa. Super. 2012)(citations omitted); *see also In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

The Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. *See* 42 Pa.C.S.A. § 6351(e), (f), (f.1), and (g). Pursuant to Section 6351(e), the trial court must hold permanency review hearings to determine the disposition that is best suited to the safety,

protection and physical, mental and moral welfare of the child. Section 6351(f)-(f.1) prescribes the pertinent inquiry for the trial court:

> **(f) Matters to be determined at permanency hearing.**— At each permanency hearing, a court shall determine all of the following:
> (1) The continuing necessity for and appropriateness of the placement.
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
> (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
> (4) The appropriateness and feasibility of the current placement goal for the child.
> (5) The likely date by which the placement goal for the child might be achieved.
> (6) Whether the child is safe.
> [...]
>
> **(f.1) Additional determination**.—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
> [...]
> (3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.
> [...]

42 Pa.C.S.A. § 6351(f)(1-5); (f.1)(3).

After a court renders a determination under Section 6351(f.1), the court shall order "continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S.A. § 6351(g). In doing so, the court

must not elevate the interests of the parents above the best interests of the child; the parent's rights are secondary. *See In re M.T.*, 101 A.3d 1163, 1172 (Pa. Super. 2014) (citation omitted). We have also said the court should consider the bond between the child and his parents, foster parents, and siblings when deciding whether to change the goal. *M.T.*, 101 A.3d at 1175 (citation omitted).

Here, the trial court conducted a permanency review hearing, made the appropriate inquiries, concluded that adoption would not best suit Child, and ordered the goal to be changed to permanent legal custodianship. The court defended its position by citing the strong, positive bonds Child has with both his Mother and his foster parents. *See* T.C.O. at 30. The court recognized that neither reunification, nor adoption would be appropriate, leaving permanent legal custody as the only viable option. *See id.*

On appeal, CYF argues generally that a permanent legal custodianship was not in Child's best interests. CYF provides hardly any relevant legal authority to support its claim, other than the fact that adoption is generally favored over permanent custody. Beyond this, CYF directs our attention to the previous testimony of Dr. Bliss (which was incorporated into the permanency review hearing).

During CYF's examination of Dr. Bliss, the psychologist testified that adoption is generally the best form of permanency. In recommending permanent legal custodianship, Dr. Bliss opined that Child's ongoing contact with Mother was paramount. But in response to CYF's probing, Dr. Bliss

conceded that she would be "okay" with termination, so long as post-adoption contact between Mother and Child would be guaranteed, *i.e.*, by an Act 101 agreement. ***See*** N.T. at 80; ***See generally*** CYF's Brief at 24-27.

CYF wants us to infer that, when the trial court relied on Dr. Bliss's testimony, the court elevated Mother's interests above the Child's interests. After all, Mother supports the court's decision to order permanent legal custodianship, and Mother apparently rebuffed repeated requests to entertain a post-adoption agreement. But we are not persuaded.

It is not the purview of the Superior Court to reweigh evidence and the credibility determinations of the trial court in order to find an abuse of discretion. ***In re R.J.T.***, 9 A.3d at 1190. We will not ignore the trial court's observation that Mother wanted what is best for the child, and for him to be safe and happy. ***See*** T.C.O., at 19-20; ***see also*** N.T. at 47. Nor can we reweigh the portion of Dr. Bliss's testimony that was adverse to CYF's position, in favor of her response to CYF's question about the circumstances under which she would be okay with termination.

Moreover, we underscore the deference owed to a dependency court, in particular:

> [W]e are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the

likelihood of success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

***In re R.J.T.***, 9 A.3d at 1190.

In sum, we conclude the trial court did not abuse its discretion when it concluded CYF failed to meet their burden that termination would best serve the Child's interest under Section 2511(b).  We also conclude the court did not abuse its discretion when it changed the goal to permanency legal custodianship, after approximately 39 months of dependency proceedings.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/8/2021</u>