J-S16023-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.L.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.M.Y., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 319 MDA 2022 |

Appeal from the Decree Entered August 12, 2021,
in the Court of Common Pleas of Adams County,
Orphans' Court at No(s):  RT-14-2020.

| | | |
|---|---|---|
| IN THE INT. OF: A.J.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.M.Y., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 320 MDA 2022 |

Appeal from the Decree Entered August 12, 2021,
in the Court of Common Pleas of Adams County,
Orphans' Court at No(s):  RT-15-2020.

| | | |
|---|---|---|
| IN THE INTEREST OF: W.A.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.M.Y., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 321 MDA 2022 |

Appeal from the Decree Entered August 12, 2021,
in the Court of Common Pleas of Adams County,
Orphans' Court at No(s):  RT-4-2021.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                **FILED:  AUGUST 5, 2022**

In these consolidated matters, H.Y.(Mother) appeals the orphans' court decision to terminate her rights to her three children – 4-year-old daughter, A.J.K; 3-year-old son, P.L.K.; and 2-year-old son, W.A.K. – pursuant to the Adoption Act. **See** 23 Pa.C.S.A. § 2511(a)(5), (8) and (b).[1, 2]  After careful review, we affirm.

The orphans' court opinion, filed pursuant to Pa.R.A.P. 1925(a), provides the relevant factual and procedural history:

> From the beginning of this litigation, the [parents'] mental health issues were identified as the root cause for the Children's removal from their home.  Initial removal for two of the three Children occurred on November 19, 2018. [FN2]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother also appeals the decision to change the goal of the dependency proceedings from reunification to adoption, pursuant to the Juvenile Act. **See** 42 Pa.C.S.A. § 6351(f).  She further alleges that the court erred when it determined that the Adams County Children and Youth Agency made reasonable efforts to reunify Mother with the Children.  These issues are separately listed before this panel.  **See** 1196, 1197, 1198 MDA 2021.

[2] The court also terminated the rights of A.S.K. (Father).  He similarly appeals the court's termination and goal-change orders.  Those appeals are separately listed before this panel, as well. **See** 1155, 1156, 1157, 1199, 1200, 1201 MDA 2021.

> FN 2: At the time, the third child, W.A.K., was not yet born. [3]

At the time, the [parents'] mental health issues and parenting limitations resulted in nutritional issues for the Children, their failure to thrive, and safety risks. Although the Adams County Children and Youth Agency ("Agency") made effort[s] through voluntary services for approximately two months to avoid an adjudication of dependency, the same proved unsuccessful due to the [parents'] indifference to developing necessary skills for the Children's development. [(A.J.K. and P.L.K. were adjudicated dependent on November 29, 2018.)] At the initial disposition hearing following adjudication, both [parents'] were clearly aware that the goals in working towards reunification required participation in a parenting skills program, undergoing mental health evaluations and complying with recommended treatment, adequately addressing the Children's medical needs, and obtaining stable housing. Early in the litigation, the Appellants' relationship to each other, including a history of domestic violence, poor interpersonal communication, and hostility, all fueled by their respective mental health issues, was recognized as an impediment to successful reunification with the Children.

Shortly following the dispositional hearing, during an overnight unsupervised visit with the [parents], P.L.K. suffered bruising and fractures of his extremities, which a medical expert opined were the result of physical abuse. Over approximately the next 12 months, Mother was attending individual counseling; however, both [parents] were unsuccessfully discharged from the Nurturing Parent Program. Nonetheless, the Agency continued to work with the family towards reunification, and the [parents] once again began [] visits. Following such a visit on December 8, 2019, it was observed that P.L.K. had bruising on both ears and a nondisplaced fracture of the left first metatarsal of his foot. Once again, medical experts opined that the injuries were indicative of physical abuse. Unsupervised visits with the Children were suspended as the Agency continued to work with the [parents] towards the originally

---

[3] W.A.K. was born in August 2019.

identified reunification objectives. Citing a lack of progress on the part of the [parents] towards achieving the reunification objectives, on September 28, 2020, the Agency filed petitions to terminate the [parents'] parental rights.

Throughout the 22-month period from initial placement to the filing of the termination petitions, neither parent successfully completed parenting classes; in fact, both were unsuccessfully discharged on at least one occasion. Although at the time of the filing of the termination petitions, both [parents] were attending parenting classes, the provider opined that Mother was only going through the motions and not substantively embracing the information and that Father was openly hostile to the providers. Indeed, subsequent to [the] filing of the petitions, both [parents] were unsuccessfully discharged for a second time.

Although Mother was attending mental health counseling, it had little impact on her behavior. For instance, in 2020, police were called to the [parents'] residence on at least nine different occasions for domestic violence. The [parents] had separated on at least two separate occasions, and a protection from abuse order was obtained by Mother against Father. Mother reported to Agency staff that she was "at her breaking point" and was harboring thoughts of self-harm. Additionally, the [parents] faced two separate sets of criminal charges for endangering the welfare of children related to the two independent unexplained occasions of bodily injury to P.L.K. Although outpatient therapy for co-parenting was provided to the [parents], they were discharged due to their inability to meaningfully communicate as the therapist described a "high relationship conflict and individualism" in their approach to their relationship. Their lack of substantive grasp of the treatment aimed at addressing the reasons for the Children's original placement stalled successful reunification. Moreover, the [parents'] inability and/or lack of interest to address the pending criminal charges and, more importantly, bail conditions that limited their visits with the Children impeded efforts at increasing the [parents' parental bond] with their Children. The end result of the [parents'] failure to prioritize their treatment needs and subsequent reunification with the Children resulted in A.J.K. being in care for approximately 27 of 44 months of her life;

- 4 -

> P.L.J. being in care for approximately 27 of 33 months of his life; and W.A.K. being in care for approximately 20 of 24 months of his life, significantly impacting the Children's ability to bond with either Mother or Father.

Trial Court Opinion (T.C.O.), 10/12/2021 at 2-4 (footnote added).

The orphans' court subsequently granted the Agency's petitions under 23 Pa.C.S.A. § 2511(a)(5), (8) and (b). The court also changed the goal of the dependency proceedings from reunification to adoption. Mother appealed both the termination decree and the goal change order. She presents the following four issues, which we have re-ordered for ease of disposition[4]:

> 1. [Pursuant 23 Pa.C.S.A. § 2511(a)(5),] [d]id the orphans' court err in determining that the Children have been removed from the care of Mother by a court order for a period of at least six months and the conditions which led to removal and placement of the children continue to exist as Mother cannot or will not remedy those conditions within a reasonable period of time; the services or assistance readily available to Mother are not likely to remedy the conditions which led to the Children's removal within a reasonable period of time; and termination of parental rights would best serve the needs and welfare of the Children?
>
> 2. [Pursuant 23 Pa.C.S.A. § 2511(a)(8)], [d]id the trial court err in determining that the Children have been removed from the care of the Mother by the court for 12 months or more and the conditions which led to

---

[4] Mother listed six issues, but we may omit two of them. One of those issues addressed termination under Section 2511(a)(2). Our review of the record indicates that while the Agency also petitioned for termination under Section 2511(a)(1) and (2), the court clarified in its Rule 1925(a) opinion that it terminated under Section 2511(a)(5) and (a)(8). The second issue we omit was a generic catchall, which merely questioned whether the court erred when it terminated Mother's rights. We omit this issue, as it is subsumed by her more specific contentions.

the removal of the Children have continued to exist and termination of the parental rights would best serve the needs and welfare of the Children?

3. Did the trial court err in determining that the pending criminal charges against Mother do not relieve her of an obligation to perform parental duties as she must utilize available resources in order to continue a relationship with the Children?

4. Pursuant 23 Pa.C.S.A. § 2511(b),] [d]id the trial court err in determining that the developmental, physical and emotional needs and welfare of the Children are best met by termination of the parental rights of Mother in order to permit stable permanency?

Mother's Brief at 7-9.

We begin our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

- 6 -

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). We add that we may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d at 1201. Importantly, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

As we may affirm under any subsection, we do not address Mother's first appellate issue, which concerns Section 2511(a)(5). Rather, we address Section 2511(a)(8), which comports with Mother's second appellate issue. That section provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> [...]

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

To terminate parental rights under Section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more from the date of the removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. **In re K.Z.S.**, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused the placement, or the availability or efficacy of the services provided by the local children and youth agency. **K.Z.S.**, 946 A.2d at 759 (citation omitted).

Mother does not contest that the Children have been removed from her care for over a year. Instead, she raises the other two elements of the Section 2511(a)(8) analysis. **See generally** Mother's Brief at 21-25, 28-29. We discuss each in turn.

First, Mother argues that the conditions which led to the Children's removal have been remedied. Mother takes a narrow view of the initial causes for the removal; she limits the conditions to the following: the improper feeding of the Children; their missed medical appointments; and P.L.K.'s

failure to thrive diagnosis. *Id.* at 28-29. She contends that those issues were resolved early in the case, and that it was only after their removal did the Agency identify additional concerns, such as domestic violence in the home and the mental health of the parents. *Id.* at 29. Thus, Mother concludes the orphans' court erred when it determined the Agency satisfied the first element of the Section 2511(a)(8) analysis.

But the orphans' court took a wider view of the conditions that led to the Children's placement. The court explained that the conditions were all safety related; that is, the Agency's concern that Mother's mental health and her parenting limitations caused the Children to be without vital care, putting them at risk. *See* T.C.O. at 2. We find the orphans' court assessment to be more accurate; all of the conditions which led to removal of the Children must be reviewed.

The question then becomes whether the conditions still exist. To that end, the orphans' court observed:

> Unquestionably, the [parents'] failure to take advantage of the Agency-provided mental health services significantly frustrated the Agency's repeated efforts to move towards reunification. Mental health issues not only hampered the [parents'] ability to provide adequate parental care but also, equally importantly, created significant physical safety risks for the Children if they returned to the [parents'] care. One need look no further than the two separate allegations of physical abuse to P.L.K. as well as an overwhelming history of domestic violence between the [parents] to conclude [that the parents'] home was an environment saturated by hostility. Consequently, the [parents'] mental health issues, if left untreated, would lead to violent consequences for the Children because these issues were the generator of the

hostility the Children experienced. Indeed, caseworkers testified to their concern over the safety risks of returning the Children to such an environment.

[…]

Neither [parent] has successfully completed parenting skills or substantively grasps the skills intended to be taught by such classes. Outpatient therapy for co-parenting has proven equally unsuccessful due to [the parents'] inability to restrain their hostile impulses, frustrating meaningful communication and cooperation. [...] At the July 30, 2020 permanency reviewing hearing, during which the Agency verbally expressed its intention to move towards termination, it was also disclosed that Mother had shared thoughts of self-harm to Agency Staff. Incredibly, even after notice of the Agency's intent, police were called to the [parents'] residence on three separate occasions for domestic violence in the month following such notice. The record is replete with objective evidence that the conditions that led to removal and placement of the Children continued to exist.

T.C.O. at 4-5, 6; **see also id.** at 11.[5]

Even if we ignore the domestic violence issue, the primary conditions which led to the Children's removal were Mother's parenting ability and concerns regarding her mental health. Contrary to Mother's argument, the record makes clear that these conditions continued to exist.

In her third appellate issue, Mother presents an alternative reason why termination would not be proper under the first element of the Section 2511(a)(8) analysis. She claims the orphans' court erred for failing to consider how Mother's bail conditions prohibited her from having contact with

_____

[5] To address the question of whether the causes of the Children's removal still exist, the orphans' court adopted that portion of its discussion under Section 2511(a)(5) which also may be applied under Section 2511(a)(8).

the Children. *See* Mother's Brief at 31-32.  She argues that forces outside of her control prevented her from demonstrating her ability to parent.  The court explained:

> [A]s a result of the first incident of unexplained injury to P.L.K. while in the custody of [the parents], criminal charges were instituted against [the parents] in neighboring York County.  While initially the conditions of bail imposed as a result of those charges hampered visitation between [Mother] and the Children, those impediments were eventually removed.  Moreover, the criminal charges were headed to a favorable non-trial disposition, which called for dismissal of the charges provided that the [parents] underwent mental health treatment and anger management, and committed no further offenses.  Unfortunately, as the Agency moved towards reunification, the [parents] were once again criminally charged in York County with a second incident of physical abuse of P.L.K., which occurred during an unsupervised visit.  They had also failed to make progress on mental health and anger management counseling.  As a result, the agreement for a non-trial disposition of the original charges was void and the charges remained pending.  Also, the new charges carried with them bail conditions which limited the contact between the children and [the parents] to virtual video contact. [FN 6].
>
>> FN 6: As the charges were instituted in a neighboring county, issues related to bail were under the jurisdiction of a court different from the Adams County courts.
>
> The record reflects that both sets of criminal charges, and concurrent bail conditions, were  pending as of the date of the initial termination hearing.  The initially scheduled termination hearing was postponed at the request of the [parents] in response to their representations that resolution of the criminal cases was imminent.  Once it was clear that those representations were inaccurate, the need for permanency for the Children outweighed further delay of this litigation.
>
> […]

- 11 -

> Although [Mother] has yet to be incarcerated as a result of the pending criminal charges, the conditions of bail created by their actions have significantly interfered with [her] ability to provide care to the Children and perhaps possibly strengthen a bond with them. While [Mother's] presumption of innocence in the criminal matter remains intact, it is not [her] guilt or innocence which has caused impediment to [her] relationship with the Children, but rather the extensive delays in the criminal proceedings, caused by [Mother's actions] or at [her] request, that has caused limitations in their ability to provide parental care. […] [FN 7].

> > FN 7: To be clear, this court did not find that the pending unresolved criminal charges are a basis to termination [Mother's] parental rights. Rather, [her] lack of urgency in addressing the impediments to parenting presented by those charges is corroborative of this court's finding of an overall inability and/or lack of interest on the part of [Mother] to make a good faith interest and effort to mitigate the causes of the Children's original placement.

T.C.O. at 12-14.

After review, we discern no error. While the orphans' court acknowledged the effect that the criminal charges had on the case, the court clarified that the unresolved charges were not the basis for termination. Critically, as Mother concedes, she was not incarcerated during the pendency of the criminal action. In other words, the restrictive bail conditions did not prevent Mother from complying with the Agency's other reunification services, which she did not successfully complete.

Having concluded that the orphans' court properly determined that the Agency established the first two elements of the Section 2511(a)(8) analysis, we address the third element: whether termination best served the needs and welfare of the Children. Like the "best interest" analysis under Section

2511(b), the court must consider "intangibles such as love, comfort, security, and stability." *In re I.J.*, 972 A.2d 5, 12 (Pa. Super. 2009) (citation omitted). The court "must also discern the nature and status of the parent-child bond, paying close attention to the effect of permanently severing the bond." *I.J.*, 972 A.2d at 12 (citation omitted). In performing a "best interests" analysis:

> The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

*Id.* (citations omitted).

Because Mother challenges the court's best interest analyses under Section 2511(a)(8) and, her in final appellate issue, under Section 2511(b), we address these contentions contemporaneously.

Mother contends that termination would not be in the Children's best interests, as demonstrated by her close bond with her oldest child, A.J.K., her 4-year-old daughter. *See* Mother's Brief at 25. She argues that she was the parent primarily responsible for A.J.K. before the Children went into foster care. *Id.* Mother also cites her testimony that A.J.K. has told her that she misses Mother and wants to come home and be with Mother. *Id.* at 26. Mother concludes that the orphans' court erred when it failed to acknowledge the bond she had with the Children and also how severing that bond would negatively affect the Children. *Id.* at 30.

In finding that termination best served the Children, the orphans' court presented a starkly different portrayal. The court opined:

> Instantly, [Mother has] only been the primary caretaker for A.J.K. for approximately a year and a half of her life; for P.L.K., approximately six months of his life; and for W.A.K., approximately four months of his life. By contrast, at the time of the termination hearing, the Children had been in the care of the current foster family for approximately 14 months. [FN 3].
>
>> FN 3: The current foster family has indicated they are a permanent resource for the Children.
>
> In essence, with the exception of A.J.K., the Children have spent more time with the foster parents than their natural parents during their critical formative years. This fact is reinforced by the Children's reference to the foster parents as "mommy" and "daddy." The record reflects a history of negative experiences for the Children when they were with [Mother] and negative behaviors by the Children upon their return from visits with [Mother]. [FN4].
>
>> FN 4: Both foster families prior to the current foster family described A.J.K. as consistently having tantrums on return from visits with [Mother].
>
> There is a paucity of evidence as to the existence of any meaningful relationship between [Mother] and the Children other than a representation by the foster mother that the Children expressed they missed their mom. [FN 5].
>
>> FN 5: […] To be clear, this court does not question [the parents'], particularly Mother's, love for the Children but rather finds that [the parents'] inability or unwillingness to address their mental health issues has stymied the development of a two-way bond.
>
> […]
>
> By contrast, hearing evidence established that the Children have not only bonded with the foster parents but also [with] the foster parents' three natural children. The Children are doing extremely well with the foster family. For instance,

- 14 -

although assessed as being developmentally delayed when placed with the foster family, they are now on a normal developmental pace. A.J.K. is attending pre-school, and P.L.K. is freely communicating despite being non-verbal when initially placed with the foster family as a two-year-old. […] Undoubtedly, the foster parents' advancement of intangibles such as love, comfort, security, and stability for the Children weighs heavily in favor of the strength of the Children's relationship with the foster parents.

T.C.O. at 9-11 (legal citations omitted).

Concerning the bond, we reiterate that the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). Moreover, a parent's own feeling of love and affection for the child does not preclude the termination. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008)). "In cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *K.Z.S.*, 946 A.2d at 762-63. Finally, we note that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 267-68.

After review, we conclude the orphans' court did not err when it concluded that termination was in the Children's best interests under Section 2511(a)(8) and (b). When the Children entered foster care, they were

- 15 -

developmentally delayed. Through the foster family's care and attention, the Children are now at an age-appropriate pace. Moreover, the court did not err when it determined there was no parental bond worth preserving. The Children have been without parental care for most of their short lives. We agree with the orphans' court assessment that Mother's inability to address her parenting issues have prevented the development of a beneficial bond between her and the Children. Meanwhile, as the Children waited for Mother to achieve reunification, they have become bonded with the foster family.

For the reasons stated above, we conclude the orphans' court did not error or abuse its discretion when it terminated Mother's rights under 23 Pa.C.S.A. § 2511(a)(8) and (b).

Decrees affirmed. Jurisdiction relinquished.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/05/2022