J-S42046-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: S.J.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1686 EDA 2023 |

Appeal from the Decree Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000515-2022

| IN THE INTEREST OF: L.J.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.J.., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1688 EDA 2023 |

Appeal from the Decree Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000514-2022

| IN THE INTEREST OF: C.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: E.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1689 EDA 2023 |

Appeal from the Order Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0001030-2019

| IN THE INTEREST OF: C.M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|

J-S42046-23

Appeal from the Decree Entered June 2, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No:  CP-51-AP-0000513-2022


BEFORE:  BOWES, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 29, 2024**

These consolidated appeals arise from a dependency matter in which the parental rights of E.J. (Father) were involuntarily terminated as to the minor children, S.J. (age 9); L.J. (age 7); and C.J. (age 6), following trifurcated goal change and termination hearings before the Court of Common Pleas of Philadelphia County (trial court).  We affirm.[1]

The Philadelphia Department of Human Services (DHS) first became involved in these cases on May 9, 2019, when it received a report from Child Protective Services (CPS) concerning C.J., who was 20 months old at the time. The CPS report indicated that the child had nearly died after sustaining burns on her feet while she was in the care of her parents, C.C. (Mother) and Father.

Mother and Father did not immediately seek treatment for the child's injuries.  Medical attention for the child was only sought once she began

_____

[1] On the same date, the trial court also entered termination orders and decrees with respect to C.C. (Mother), who appeals those rulings in the related cases, docketed at appellate case numbers, 1678-1683 EDA 2023.

having a seizure, at which point she was taken to the Children's Hospital of Philadelphia (CHOP). At CHOP, the child went into cardiac arrest and had to be resuscitated. Once C.J. had stabilized, her blood was tested, and it revealed her exposure to methamphetamines, which was a likely cause of her seizure and cardiac arrest. Multiple surgeries were needed in order to treat her burns.

Mother and Father were questioned about how C.J. had been burned and exposed to methamphetamines, but they were unable to explain how the accident happened, and how the substance had gotten into the child's system. Father himself tested positive for methamphetamines a few days after C.J.'s accident, and his probation officer informed him that he would be ordered to receive substance abuse treatment.

The same day that C.J. was injured, DHS agents conducted forensic interviews with her siblings, S.J. and L.J. The children explained that C.J. had crawled into a bathroom sink and turned on the hot water faucet, causing her legs to be scalded. According to the children's account, they were unsupervised at the time, as Father and their paternal grandmother had been in another room.

After C.J. was discharged from CHOP, DHS arranged for S.J. and L.J to stay with their maternal grandmother, V.C., who was an identified caregiver of the children. Mother and Father signed a safety plan implemented by DHS regarding the children's care. C.J. was discharged from the hospital about

two weeks after her admission, and she was released into the care of V.C. along with her two siblings.

The trial court held an adjudicatory hearing on June 26, 2019, and adjudication was deferred. The children were placed in the care of their maternal aunt, C.M. Both Mother and Father were permitted supervised visitation and required to undergo random drug screenings.

On August 8, 2019, a single case plan was created for Mother and Father outlining their parental objectives for reunification. Father was required to participate in a program with the Achieving Reunification Center, continue drug screenings, and take part in weekly supervised visitations with the children.

On December 20, 2019, following a criminal investigation concerning C.J., both Mother and Father were charged with endangering the welfare of a child and reckless endangerment. Father was also charged with one count of aggravated assault, and as of an adjudicatory hearing held on April 28, 2020, Father was incarcerated in connection with the criminal charges.

On June 17, 2019, DHS petitioned the trial court to adjudicate C.J. as a dependent child based on the unexplained and near fatal injuries the child had sustained in her parents' care. Petitions were also filed to that same effect regarding C.J.'s older siblings, S.J. and L.J. The three children were then adjudicated dependent, and they were committed to the custody of DHS. They were ordered to remain in the care of C.M., while having weekly supervised visits with Father. The goal for the children was identified as

- 4 -

reunification. It was further ordered that, upon release from incarceration, Father was also referred to the Clinical Evaluation Unit (CEU) for a dual diagnosis assessment.

At a permanency review hearing held on December 9, 2020, the trial court ordered that the three children would remain in the care of their aunt, C.M. Mother and Father were required to continue undergoing random drug screenings and assessments. The home was to be visited and assessed by the Community Umbrella Agency (CUA). Mother and Father were also referred for a Parent Capacity Evaluation (PCE) (which ultimately took place on April 19, 2022). The trial court ruled that there existed aggravating circumstances[2] as to both Mother and Father, and that the CPS report sent to DHS on May 9, 2019, was well founded. DHS was directed to continue assisting Father in achieving his reunification objectives.

Thereafter, the trial court held permanency review hearings every few months. On December 28, 2021, DHS sought to modify Father's visitation because days earlier, he had become irate with the CUA case manager at C.M.'s home. Father then sent a number of hostile text messages to the case manager, who as a result felt unsafe supervising visits in any of the homes of

---

[2] Aggravated circumstances are defined in pertinent part as a situation in which a child is in the custody of a county agency and the child's parents "have failed to maintain substantial and continuing contact with the child for a period of six months." 42 Pa.C.S.A. § 6302. There may also be aggravated circumstances when a child "or another child of the parent has been the victim of physical abuse resulting in serious bodily injury[.]" *Id*.

the family. DHS requested to host all future visits at DHS's offices, and the trial court granted the request.

A revised single case plan for Father was put into effect on May 18, 2022. It required Father to continue participating in supervised visitation, submit to three random drug screenings, avail himself of permanency planning, submit to a PCE, and provide documentation of employment, earnings, and housing to the CUA.

At a permanency review hearing held on July 6, 2022, the trial court found that Father had only minimally complied with his permanency plan. Father had undergone a PCE, but he had not provided documentation of treatment for drugs and alcohol; nor had he provided proof of employment and income. He only completed one of three required drug screenings. The trial court ordered Father to continue working toward the completion of all outstanding objectives of the SCP.

On August 25, 2022, DHS filed petitions for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), 2511(a)(8), and (b). DHS stated in the petitions that Father had failed to remedy the circumstances that had caused the children to put in DHS's custody. Crucially, Father had not adequately addressed his substance abuse issues in compliance with his SCP objectives, which had been explained to Father at numerous permanency hearings. Accordingly, DHS sought the termination of Father's parental rights, and to change the permanency goals of the three children from reunification to adoption.

The hearings on the petitions for the three children were held on February 10, 2023; April 12, 2023; and June 2, 2023. Father was represented by legal counsel, and the children were represented by a child advocate. At these hearings, the trial court heard the testimony of Samir Ismail (the assigned CUA caseworker), and Dr. Elizabeth Johnson (an expert in the field of PCE's who evaluated both Mother and Father). Father testified on his own behalf.[3]

Dr. Johnson met with Father on May 11, 2022, for the court-ordered PCE. The central purpose of the PCE was to assess Father's strengths and weaknesses as a parent. According to Dr. Johnson, Father's strength as a parent was evidenced by the fact that he had reported several sources of support in his family, he had a realistic housing plan, and he was about to begin a new job. Father also readily discussed his history of drug addiction, and intention to rebuild trust with his children.

However, these strengths were overshadowed by a number of weaknesses Dr. Johnson identified. Father had named Mother as his primary support, and she in turn had continually struggled with addiction herself. While Father was forthcoming with respect to his substance abuse issues, Dr. Johnson found that Father had difficulty acknowledging his history of aggressive behavior and inability to regulate his emotions.

_____

[3] Mother also testified, but her testimony is not germane to the issues raised in Father's appeals.

Moreover, Father admitted that he had not attained sobriety since the inception of the dependency cases. He further insisted that the assigned CUA case worker had falsified reports about Father's conduct. Father appeared to understand that substance abuse had impeded his ability to act as a parent, but Father had not outlined a clear path toward becoming fully sober, as he had self-reported sobriety periods of no longer than 15 days. Father was not aware of the children's needs and had not expressed much interest in them beyond scheduling visitation.

Dr. Johnson testified that Father has not yet overcome the circumstances that had caused the children to be placed in the custody of DHS. Rather, Father still requires services to maintain sobriety, modify his aggressive behavior, and fully appreciate the impact that his substance abuse has had on his children.

Samir Ismail testified in line with Dr. Johnson, opining that Father had not taken the steps necessary for reunification. Ismail had been assigned to assist Father in achieving the objectives of his SCP, which included dual diagnosis treatment and random drug screenings; providing proof of employment; obtaining stable housing; and cooperating with supervised visitation. Ismail was confident that Father understood all of these objectives because they had been explained numerous times at SCP meetings and court hearings.

Ismail testified that Father did not maintain regular contact with CUA despite its regular outreach. Father would contact CUA to schedule visitation, but he never inquired about how the children were doing, or any appointments they had. Although Father had attended dual diagnosis treatment, there was no evidence that this led to any extended periods of sobriety.

Ismail rated Father as only moderately compliant with his SCP objectives because he has continued to abuse substances, and not provided proof of income. His progress was rated minimal, due to ongoing concerns about substance abuse and his pending criminal matter arising out of his abuse of C.J. Father's employment and housing situation also remained uncertain despite that he had been required to produce proof of his progress in those areas. Ismail also received no information about Mother and Father's current living situation.

Finally, Father never progressed beyond supervised visits with the children. Although Father had consistently attended scheduled visits, Ismail could not recommend unsupervised visitation due to his substance use. Additionally, Ismail recalled that in December 2022, Mother and Father entered guilty pleas in connection to criminal charges stemming from C.J.'s near fatal accident. At around that time, the children expressed discomfort with attending supervised visits with Father.

This had prompted the trial court to order that all that contact between the children and their parents would be supervised and at the children's

discretion. From then on, however, no visits between the children and their parents took place, either in person or virtually, as the children preferred not to see them. The children did not speak with Father on the telephone, and they never expressed to Ismail any interest in doing so. Ismail noted that L.J. and C.J.'s behavior in the kinship home had improved after their visits with Father had ceased.

Ismail testified that all three children live in kinship care with their maternal aunt, C.M., where they have been since the outset of the dependency proceedings, for nearly four years as of the time of the final termination/goal change hearing. C.M.'s husband and three children also reside in the home. These cousins are approximately the same ages as S.J., L.J., and C.J., and all the children get along well with each other.

S.J., L.J., and C.J., consider C.M. and her husband to be their parents, referring to C.M. as "Mom," and their uncle as "Dad." Ismail opined that C.J., S.J., and L.J. shared their primary parental bond with C.M. and that they were bonded with her and her family. It was evident to Ismail that C.M. ensured that the children were safe, in a stable environment, and loved, and that all their medical and educational needs were being met.

All three children are doing well in school, and they are progressing well in their studies. C.M. and her husband have attended to all of the three children's medical and educational needs. For example, L.J. and C.J. receive physical, occupational, and behavioral therapy, as well as services for

developmental delays. C.J. has no current medical needs, but she was seen regularly by a specialist to be treated for her severe burns. C.M. and her husband have ensured that the children receive all needed services and that they attend their appointments.

In contrast, Ismail did not observe such a bond between the children and Father. Due to Father's lack of interest, and his inability to address his own substance abuse and mental health needs, Ismail did not believe that Father could match the level of parenting and care that C.M. had been able to give the children.

In light of these circumstances, Ismail did not anticipate that any of the children would suffer irreparable harm if Father's parental rights were terminated. The children had enjoyed a safe and happy kinship home for almost four years, and it was Ismail's opinion that adoption was the most appropriate permanency goal for them. Further, Ismail relayed that the children strongly preferred to be adopted by their aunt and uncle, who they viewed as their parents.

At the permanency hearings, the children's advocate corroborated Ismail's testimony regarding their preference. The advocate testified that on four separate occasions, the children adamantly stated that they wanted to remain in their aunt's home and not return to the care of Father.

Father testified during the proceedings. He accused Ismail of perjury and insisted that he had sufficiently complied with his reunification goals. The

trial court described Father's conduct as "extremely disruptive," and his testimony in that regard was not credited. **See** Trial Court 1925(a) Opinion, 9/5/2023, at 14.

As to his reunification goals, Father testified that he was residing with the children's maternal grandmother, and that this home was suitable for the children. With respect to employment, Father testified that he works as subcontractor, receiving a weekly paycheck. Father admitted that he had not provided CUA with written documentation of his employment.

Father testified that since November 2022, he has been enrolled at the Goldman Clinic for substance abuse treatment. He stated that he attends the clinic for therapy every day, that he attends group counseling at least twice a month, and that he has individual counseling monthly. He admitted that he was using opioids while simultaneously engaged in methadone maintenance treatment at the Goldman Clinic. Father acknowledged that his drug use had affected his ability to be parent to the children, but he did not fully appreciate how his children had suffered due to his drug use in the past.

Initially, Father claimed that he had not been sentenced in the criminal case relating to the abuse of C.J., but he was forced to admit that he had in fact been sentenced to a prison term of 11.5 to 23 months, and that he was scheduled to surrender to authorities on June 27 of that year.

At the conclusion of the termination and goal change hearings, the trial court determined that there existed a parent/child bond between the three

children and their current caregiver. The testimony of DHS's witnesses was found to be credible, and Ismail's testimony in particular was afforded great weight. Conversely, the testimony of Father was found to be not completely credible, and the evidence presented at the hearings demonstrated that he had not made adequate progress toward reunification. The conditions which had caused the children to be put into the custody of DHS had not been remedied, and the children themselves very much wanted to be adopted by their aunt because they shared a parental bond with her and not with Father.

Thus, the trial court found clear and convincing evidence that Father's parental rights over the children should be involuntarily terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), and that termination was in the children's best interest pursuant to 23 Pa.C.S.A. § 2511(b); it was likewise found that termination would not have a detrimental effect on the developmental, physical, and emotional needs of the three children. *See* Trial Court 1925(a) Opinion, 9/5/2023, at 16.

On June 2, 2023, the trial court entered decrees terminating Father's parental rights as to all three children, as well as orders changing the permanency goals of the children from reunification to adoption. Father timely appealed the termination orders and decrees.[4]

---

[4] Father sought to appeal the decrees of involuntary termination and the goal change orders entered as to each of the three children. However, in the appeals docketed at case numbers 1685 EDA 2023 (goal change as to S.J.)
*(Footnote Continued Next Page)*

The trial court entered an opinion pursuant to 1925(a), and Father now raises the following issues for our consideration in his brief:

> 1. Did the Trial Court err in terminating [Father's] rights under 23 Pa.C.S.[A. §§] 2511(a)(1), 2511(a)(2), 2511(a)(5), and 2511(a)(8)? its discretion, when it involuntarily terminated mother's parental rights under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), § 2511(a)(2), § 2511(a)(5), and § 2511(a)(8)?
>
> 2. Did the Trial Court err in finding that termination of [Father's] parental rights best served the children's developmental, physical and emotional needs under 23 Pa.C.S.[A. §] 2511(b)?

Appellant's Brief, at 8. (suggested answers omitted).

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

---

and 1687 EDA 2023 (goal change as to L.J.), Father attached the incorrect orders to the notices of appeal, resulting in those two appeals being quashed on August 18, 2023.

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Rather, an abuse of discretion occurs "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference given to trial courts, who often observe the parties first-hand across multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d at 1123-24; *see also See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (same).

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.* 265 A.3d at 591. As such, the moving party must establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted).

The trial court must apply a two-part test when considering a petition to terminate parental rights. *See* 23 Pa.C.S. § 2511. The first part concerns the conduct of the parent under the grounds enumerated in Section 2511(a),

which must be proven by clear and convincing evidence. *See id*.; *see also In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010).[5] Each of those enumerated grounds must be evaluated as written, and courts should not employ a "balancing" or "best interest" approach when evaluating any one factor. *In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

The second part of the test set forth in Section 2511 concerns the "developmental, physical and emotional needs and welfare of the child." *See* 23 Pa.C.S. § 2511(b). Relevant considerations in this analysis include whether there exists a parental bond between the child and parent, as well as the effect that permanently severing the bond may have on the child. *See id*. Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, and termination is in the child's best interests under Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Neither of the two parts of the test require consideration of whether a government agency made reasonable efforts in assisting a parent to remedy the conditions that led to the child's placement, such as a parent's lack of capacity to provide care. *See In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014).

---

[5] "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa. 1989).

Denying termination for that reason would only "punish an innocent child" rather than promote the child's best interests. *Id*.

In the present case, Father appeals the trial court's termination of his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and 2511(b). These statutory provisions read as follows:

(a) General rule. The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either had evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or

placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), the court shall not consider any efforts by the parents to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Each these provisions will be evaluated in turn below, beginning with subsection 2511(a)(1). Under this subsection, parental rights may be involuntarily terminated when "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Pa.C.S.A. § 2511(a)(1). The inquiry under subsection 2511(a)(1) focusses on the conduct of the parent for at least a six-month period prior to the filing of the petition, and whether it reveals a settled purpose of relinquishing a parental claim to a child or a failure to perform parental duties. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2000).

"Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights," a three-part inquiry follows:

"1) the parent's explanation for his or her conduct; 2) the post-abandonment contact between parent and child; and 3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998). "To be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to undertake the parental role. The parent wishing to re-establish [his] parental responsibilities bears the burden of proof on this question." *In re Z.P.*, 994 A.2d at 1119. "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles[.]" *Id*., at 1118.

Here, the record shows that, in the six months prior to the filing of the termination petitions, Father had failed to perform parental duties, and that he did not avail himself of CUA services to achieve his reunification objectives. The trial court credited Ismail's testimony to find that Father had failed "to remedy his drug dependency and to provide CUA with documents regarding drug treatment . . . proof of income   . . . proof of suitable housing  . . . and never progress[ed] to unsupervised visits with [the] Children." Trial Court Opinion, 9/5/2023, at 10-11, 16.

Father's sobriety remained in question at all relevant times because he did not consistently comply with court-ordered drug screenings.  In fact,

Father admitted to relapsing frequently during his drug treatment, and he did not maintain regular contact with CUA or promptly produce requested documentation regarding his treatment.

Next, Father failed to demonstrate that he could provide stable housing and maintain consistent employment. He refused to submit this information to CUA despite multiple requests. Nor did he ever produce documentation of his wages and the length of his employment. As such, it could not be discerned how long Father had been employed, how many hours he worked, or how much money he was able to earn. Ismail also did not know Father's present living situation.

Finally, Father failed to maintain significant contact with the children because he only saw them, at most, once a week in a supervised setting. Ismail explained that visitation never progressed beyond weekly supervised contact due to Father's ongoing substance use. The children declined visits with Father as soon as they were given that choice.

At the dependency hearings, Father appeared to appreciate that substance abuse had impaired his ability to function as a parent, but throughout these cases he proved unable to make progress in his own drug treatment. This greatly attributed to Father's failure to progress to unsupervised visitation with the children; as did Father's criminal conviction with respect to the abuse of C.J.

Thus, the evidence was sufficient for the trial court to conclude that Father failed to perform parental duties and that he had demonstrated a settled purpose to relinquish his rights. The trial court's findings with respect to subsection (a)(1) must therefore be affirmed because they are supported by the record.[6]

The same is true as to the trial court's findings with respect to subsection 2511(a)(2). Pursuant to this provision, a parent's failure to remedy the conditions resulting in the child's placement is not confined to express misconduct by the parent. Rather, termination may be justified under this subsection where it is shown that a parent has caused a child to be without essential parental care needed for the child's well-being due to the parent's "repeated and continued incapacity, abuse, neglect or refusal of the parent," and the parent is unable to remedy those deficiencies. 23 Pa.C.S.A. § 2511(a)(2); *see also In re N.C.*, 763 A.2d 913 (Pa. Super. 2000) ("[P]arents who are incapable of performing parental duties are no less unfit than parents who refuse to perform them."). The focus of subsection 2511(a)(2) is on the child's present and future needs.

Here, the trial court found clear and convincing evidence in the record to determine that Father lacked the capacity to perform parental duties, and that he would be unable to do so in the future. Dr. Johnson, an expert in

---

[6] The effect of termination of parental rights on the children will be addressed separately below in our discussion of Section 2511(b).

parenting capacity who evaluated Father in April 2022, explained that Father's primary parenting weakness was his ongoing pattern of substance use. Father did not demonstrate progress with his substance abuse treatment at any point thereafter.

Father acknowledged that his drug use had played a part in his aggressive behavior, including his altercations with CUA caseworkers, but he nevertheless alleged that Ismail had deliberately misrepresented what he had observed in his testimony. Similarly, Father seemed to appreciate to some degree that his substance use had affected his overall ability to function as a parent, including the impairment of his judgment on the day that C.J. was seriously injured. After hearing the respective testimony of Father and DHS's witnesses, the trial court found the latter testimony to be credible, ruling that Father's testimony was "self-serving and not completely credible." **_See_** Trial Court 1925(a) Opinion, 9/5/2023, at 16. The trial court concluded that the children had been deprived of essential parental care due to the repeated and continued incapacity, abuse, neglect or refusal of Father, and that Father had been unable to those deficiencies. As those findings are supported by the record, they must be upheld.

Next, we consider whether the trial court abused its discretion in denying the termination of Father's parental rights under subsection 2511(a)(5). Parental rights may be terminated under this subsection where (1) the child has been removed from parental care for at least six months; (2)

the conditions which led to the removal and placement of the child continue to exist; (3) the parent cannot remedy those conditions within a reasonable period of time; (4) the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. **See 23 Pa.C.S.A. § 2511(a)(5); *see also In re Z.P.*,** 994 A.2d at 1118.

In this case, the trial court found that each element of this subsection had been satisfied. The children had been removed from Father's care for over three years prior to the date on which DHS petitioned for the termination of his parental rights, well over the required statutory period. The children came into care because of Father's failure to seek appropriate medical treatment for the severe burns to C.J., as well as the fact that C.J.'s cardiac arrest and seizures had been caused by her exposure to methamphetamines. Father also admitted that his substance abuse had affected his judgment and prevented his daughter from immediately receiving appropriate medical care. Father admitted to using methamphetamines himself at the time that C.J. was injured, and he was convicted of criminal offenses arising from the child's near-fatality.

It was undisputed that Father attempted to satisfy some of his reunification objectives – he received some dual assessment treatment, attended supervised visits with the children, and he submitted to a PCE.

However, the trial court heard competent testimony that Father's ongoing substance abuse had impaired his ability to safely care for the children and prevented the implementation of unsupervised visitation.

The trial court heard no evidence as to how reunification might reasonably be obtained in the near future in light of his lack of cooperation with DHS and ongoing incapacity. Even assuming that Father made significant strides with respect to housing, employment, and participation in treatment, those improved circumstances would not remedy the chief parenting deficiency that caused the children to be put into care. DHS nevertheless introduced clear and convincing evidence that Father never achieved sobriety to the extent necessary for him to function as a parent to the children. The trial court's ruling with respect to subsection 2511(a)(5) must therefore stand because it is supported by the record.

The last ground for termination that we address is stated in subsection 2511(a)(8), which requires clear and convincing evidence of the following elements: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions that led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs of the child. *See* 23 Pa.C.S. § 2511(a)(8); *see also In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009).

Subsection 2511(a)(8) does not contemplate the implementation of any additional or ongoing present services to assist a parent in remedying the

presenting conditions, nor an evaluation of a parent's willingness or ability to remedy them. *See In re Adoption of R.J.S.*, 901 A.2d 502, 511-12 (Pa. Super. 2006). A court only needs to determine that the conditions leading to a child's placement in care continue to exist. *See id*. Termination may be denied under subsection 2511(a)(8) if all conditions necessitating placement have been remedied, and reunification is "imminent at the time of [termination] hearing." *In re I.J.*, 972 A.2d at 11.

Here, the children had been in care for approximately three years, meeting the time requirements of subsection 2511(a)(8). The children initially came into care in large part due to Mother's and Father's extensive drug use, contributing to C.J.'s exposure to methamphetamines, severe burns, seizure, and cardiac arrest. As a result, the trial court made findings of aggravated circumstances against both parents.

To address the children's dependency, the trial court ordered Father to engage in substance use and mental health treatment, to submit to random drug screens, and to complete a PCE and follow recommendations. The CUA also added SCP objectives of suitable housing and employment and visitation with the children.

But, as outlined above, Father made minimal progress toward reunification with the children, and the conditions necessitating the children's placement were never remedied. In addition to his continuing substance

abuse and mental health issues, Father's housing and employment situation remained unclear.

In sum, then, the evidence showed that the conditions necessitating the children's placement had not been remedied at the time of the termination hearings, and that Father would not imminently be able to do so.  The trial court therefore did not err in ruling that involuntary termination of Father's parental rights was warranted under subsection 2511(a)(8).

Turning to Section 2511(b), we again find that the trial court did not abuse its discretion in terminating Father's parental rights.   Once any of the grounds in Section 2511(a) are met, the trial court must rule on whether termination is warranted under Section 2511(b) by evaluating the child's best interests.  In doing so, the trial court must "give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S.A. § 2511(b).

"This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated." *In re K.H.B.*, 107 A.3d 175, 180 (Pa. Super. 2014) (quoting *In re K.Z.S.*, 946 A2d 753, 764 (Pa. Super. 2008)).   Courts must consider whether the child has a parental bond with a foster parent and whether they are currently in a pre-adoptive home.  *See In re T.S.M.*, 71 A.3d 251, 268

(Pa. 2013) (the existence of a pre-adoptive home is "an important factor" in termination cases).

In this case, Ismail believed that Father would be unable to provide the children with the same level of parental care that C.M. could. Father expressed little interest in the children's needs since the time that they went into the custody of DHS. Ismail testified that none of the children would suffer irreparable harm if Father's parental rights were terminated because the children were thriving in the kinship home. In fact, all three children had expressed the desire to remain with C.M. and not return to the care of Father. As soon as the children had the choice of whether to continue seeing Father, visitations (and all communications) ceased, and the behavior of the children in the kinship home improved.

The testimony of DHS's witnesses was for the most part uncontroverted, and it showed that the children's bond with Father is attenuated, and that remaining in the pre-adoptive home is in the children's best interests. Accordingly, we find that the trial court did not abuse its discretion as to subsection 2511(b) because the record supports the finding that Father could not meet the children's emotional and physical needs, and that the children

have instead developed their primary parental bond with their aunt, who has been caring for the children for the past several years.[7]

Orders and decrees affirmed.

Judge Bowes joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/29/2024

---

[7] Father's appeals as to the trial court's goal change orders for S.J. and L.J. were quashed on procedural grounds, and he does not raise any issues relating to the goal change order for C.J. in his appellate brief, resulting in the waiver of any claim that it was erroneously entered. Regardless, in light of our holding above concerning the termination of Father's parental rights as to all three children, any issue with respect to the goal changes is moot. **See In re Adoption of A.H.**, 247 A.3d 439, 446 (Pa. Super. 2021) ("[T]he effect of our decision to affirm the . . . termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption.").